**STATE of Missouri, Respondent,**

v.

**James E. MURPHY, Jr., Appellant.**

**No. WD 35457.**

Missouri Court of Appeals,
Western District,
Division One.

May 21, 1985.

Motion for Rehearing and/or Transfer
to Supreme Court Overruled and
Denied July 2, 1985.

Application to Transfer
Denied Aug. 7, 1985.

David M. Strauss, Public Defender, Columbia, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Michael H. Finkelstein, Asst. Attys. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P.J., and KENNEDY and LOWENSTEIN, JJ.

SOMERVILLE, Presiding Judge.

Defendant was charged with capital murder (§ 565.001, RSMo 1978), and tried in Cole County on change of venue. The state waived the death penalty, defendant waived trial by jury, and the trial judge found defendant guilty as charged and sentenced him to imprisonment for life without eligibility for probation or parole for fifty years.

Pursuant to a formal warrant issued out of Pulaski County, defendant and his wife were arrested on the morning of May 20, 1981, for capital murder. The victim was Vesta Lee Martin, a resident of Pulaski County. On the same date, to-wit, May 20, 1981, an Associate Circuit Judge of Pulaski County appointed the acting Public Defender of the 25th Judicial Circuit to represent both defendant and his wife. Prior to a pre-trial hearing and defendant's trial on the merits, counsel just mentioned withdrew and the Public Defender of the 13th Judicial Circuit was appointed to represent defendant.

A pre-trial hearing on motions of defendant to suppress a video-taped confession and certain evidentiary items seized pursuant to a search warrant, given and seized during the time frame when defendant was represented by the Public Defender of the 25th Judicial Circuit, eclipsed, in ultimate importance, defendant's trial on the merits. Defendant's video-taped confession in particular, ruled admissible by the trial judge, rendered trial of the capital murder charge on its merits a routine formality with no evidence whatsoever offered on behalf of defendant.

Although defendant does not question the sufficiency of the evidence to support the guilty verdict, he rails against admission of his video-taped confession, items seized pursuant to a search warrant, and hearsay testimony by a state's witness. Defendant's cry for appellate relief is summed up in four points: (1) the trial court erred in admitting defendant's video-taped confession because representation of both defendant and his wife by the public defender up to and including the time when the video-taped confession was obtained constituted a conflict of interest depriving defendant of his right to effective assistance of counsel in violation of the Sixth Amendment of the Constitution of the United States; (2) the trial court further erred in admitting defendant's video-taped confession in violation of defendant's Sixth Amendment right to effective assistance of counsel because the public defender made no investigation of the facts or explored possible defenses prior to defendant's (and his wife's) acceptance of a "package" plea bargain agreement worked out with the state; (3) the trial court erred in admitting certain evidentiary items obtained by law enforcement officers pursuant to a search warrant, because the warrant was obtained and executed in violation of defendant's rights under the Fourth and Fourteenth Amendments of the Constitution of the United States in that affidavits in support thereof were insufficient to sustain a finding of probable cause, and, further, the scope of the warrant was "overbroad"; and (4) the trial court erred in permitting a co-conspirator to testify about certain conversations with the victim's stepson because the same occurred before defendant "became a member of the alleged conspiracy".

The setting of this case is a cold-blooded "contract" killing perpetrated by defendant, apparently to satisfy a voracious drug habit. One is hard put to discuss this case without poignantly observing that violence and tragedy, far too frequently associated with the illicit drug problem plaguing this country, silently stalk the facts of this case throughout and leave their subliminal imprint upon the record.

The victim's stepson engaged a Ronald Wood to ferret out someone to kill his stepmother for an agreed sum in cash.[1] Wood, as "broker", finally struck a deal on behalf of the stepson with defendant to kill the victim for $10,000.00. Part of the $10,000.00 was to be paid by the stepson to defendant "up front", and the balance was to be paid after the homicide was committed. Defendant's wife was usually with him (although not within hearing distance) on a number of occasions when Wood and defendant met to discuss the homicide. The stepson, via Wood, supplied defendant with a duplicate set of keys to the victim's home, information as to the location of a loaded .38 caliber revolver located therein, the general "layout" of the victim's home, and the fact that the victim was going out to dinner on the evening of May 15, 1981. Wood drove defendant by the victim's home prior to May 15 to familiarize him with its location. Wood also suggested that defendant ransack the victim's home after killing her to make it "look like a burglary."

Defendant entered the victim's home on the evening of May 15, 1981, while she was out to dinner and, armed with the victim's loaded .38 caliber revolver which he located when he first entered, lay in wait until she returned. When the victim entered her home defendant shot her twice with the .38 caliber revolver—the first shot "spun her around", causing her to fall "to the floor" and then, after wrapping a towel around the revolver, the victim was shot a second time "in the head" as she lay on the floor. Defendant took several items of jewelry, including rings and earrings the victim was

wearing, a watch, a gold chain and bracelet, some "money", and the .38 caliber revolver when he left the victim's home. Defendant also stole the victim's automobile and drove it to a point south of Lebanon where it was burned. The following morning, May 16, 1981, defendant met Wood, who "brokered" the contract killing, and gave him two rings which had been removed from the victim and two spent .38 caliber shells. In return, Wood gave defendant $4500.00 in cash.

On May 18, 1981, Wood was arrested for his complicity in the homicide. Still playing the role of a "broker", Wood obtained a promise of complete immunity from the state in return for implicating defendant and his wife. A warrant was issued for the arrest of defendant and his wife on the basis of a felony complaint, and the pair were arrested on the morning of May 20, 1981, near Bourbon, Missouri. They were then taken to the Pulaski County Courthouse where, shortly after their arrival, an associate circuit judge appointed the Public Defender of the 25th Judicial Circuit to represent them.

An investigator for the public defender's office visited defendant and his wife at the Pulaski County jail on the afternoon of May 20, 1981, and the public defender contacted them for the first time about noon on May 21, 1981. In addition to defendant's implication in the homicide, he was thought to be privy to salient facts concerning the attempted bombings of several highway patrol cars, the trial of one of which was set for the coming week. The homicide and the attempted bombing case scheduled for trial were local causes celebres, involving an assistant attorney general, prosecuting attorneys of two counties, and numerous highway patrolmen and sheriffs and deputies. Keen on obtaining defendant's cooperation as a witness on behalf of the state at the trial of the forthcoming attempted bombing case, the public defender was contacted on the afternoon of May 21, 1981, and, after being made aware of the damaging testimony of Ronald Wood

1. The stepson was apparently dissatisfied with the stepmother's share of his late father's estate.

and certain corroborating evidence, was apprised of a suggested "package" plea bargain agreement. In return for defendant's plea of guilty to the capital murder charge, giving statements to law enforcement officials about the homicide, testifying on behalf of the state at the trial of homicide charges leveled against the victim's stepson, and, as well, at the trial of others involved in the attempted bombing cases, the state agreed to waive the death penalty against defendant, and, further, to dismiss all homicide charges against defendant's wife and recommend a sentence of ten years to a plea of guilty by her to a charge of felony theft.

When the public defender first broached the "package" plea bargain agreement with defendant and his wife, defendant passively accepted the terms of the "package" plea bargain agreement as related to him, but rejected outright those which related to his wife. It is fair to say that defendant's principal concern was for his wife, as he was adamant that she should receive a lighter sentence. Defendant's resolute attitude was not wasted as the state finally yielded and agreed to a reduced sentence of seven (7) years for his wife.

Defendant gave the controversial videotaped confession on May 27, 1981, in the presence and company of the public defender appointed to represent him and his wife. Both before and at the time of going on camera, defendant was given a series of *Miranda* warnings, orally and in writing. Defendant, under point (1), contends that joint representation of him and his wife by the public defender during the negotiations and culmination of the "package" plea bargain agreement constituted a "blatant" conflict of interest which fatally tainted his video-taped confession on grounds of ineffective assistance of counsel in violation of his rights under the Sixth Amendment of the Constitution of the United States.[2]

Defendant rotely advances a number of propositions, accompanied by a citation of authorities, with which the state does not take issue. The Sixth Amendment to the Constitution of the United States, applicable to the States by the Fourteenth Amendment, guarantees an accused in a state criminal proceeding the right to the assistance of counsel. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); and *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). The Sixth Amendment guarantees not only the presence of counsel, but the effective assistance of counsel. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); and *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Ineffective assistance of counsel is tantamount to no representation. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); and *Reece v. Georgia,* 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955). Temporally speaking, the right of counsel under the Sixth Amendment had attached to defendant at the controversial times in question.[3] *Escobedo v. Illinois,* supra; and *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

Generally speaking, the proper standard for assessing "attorney performance" vis-a-vis the Sixth Amendment "is that of reasonably effective assistance". *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

---

**2.** The Sixth Amendment right to counsel relied on by defendant in the instant case is separate and distinct from the right to counsel delineated in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as a procedural mechanism to protect an individual's constitutionally protected right against self-incrimination under the Fifth Amendment.

**3.** It is worthy of mention that the state does not question that defendant's Sixth Amendment right to counsel had attached. As noted in *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Sixth Amendment right to counsel attaches when adversary judicial proceedings are initiated against an accused "by way of *formal charge,* preliminary hearing, indictment, information or arraignment." (emphasis added)

Although unmentioned by defendant, he carried a dual burden of proving that the public defender failed to exercise "the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and that he [the defendant] was prejudiced thereby." *Love v. State*, 670 S.W.2d 499, 501 (Mo. banc 1984). See also *Strickland v. Washington*, supra, 466 U.S. at ——, 104 S.Ct. at 2064.

While peripherally enlightening, the sweeping principles and authorities, supra, cited by defendant do not answer the crucial question posed by defendant's first point—what is the applicable standard for determining whether representation of multiple defendants violates an accused's Sixth Amendment right to effective assistance of counsel? A trilogy of decisions by the Supreme Court of the United States intermittently cited by defendant, do so, however: *Glasser v. United States*, supra; *Holloway v. Arkansas*, supra; and *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). These cases reflect a metamorphosis regarding a standard for assessing an accused's Sixth Amendment right to the effective assistance of counsel in the context of counsel's representation of multiple defendants. Although charges of ineffective assistance of counsel due to representation of multiple defendants in *Glasser*, *Holloway* and *Cuyler* arose from factual backgrounds different from those in the instant case, and, as well, at different procedural levels (before trial in *Glasser* and *Holloway* and after trial in *Cuyler*), evolvement of the standard arrived at in *Cuyler* is highly probative in disposing of defendant's first point.

In *Glasser*, the court, on the basis of facts as opposed to mere speculation, found that counsel's representation of multiple defendants constituted a conflict of interest, and concluded that it was unnecessary to determine the "precise degree of prejudice" suffered by Glasser as counsel's representation was not "as effective as it might have been". *Glasser v. United States*, supra, 315 U.S. at 75–76, 62 S.Ct. at 467–468. The court's use of "prejudice" in *Glasser* raised some lingering doubts. At one point it appeared to have been used in the sense that the conflict of interest reduced counsel's effectiveness concerning his representation of Glasser. At another point it appeared to have been used in the sense that the conflict of interest reduced counsel's effectiveness so substantially that it caused Glasser's conviction. *Glasser v. United States*, supra, 315 U.S. at 75–76, 62 S.Ct. at 467–468.

In the wake of *Glasser*, the court in *Holloway* attempted to allay some of the confusion arising from *Glasser's* use of the word "prejudice". By way of summarization, *Holloway* appears to hold that trial courts must presume "prejudice" to a defendant, and, concomitantly, violation of an accused's right to effective assistance of counsel, whenever the latter objects to multiple representation and the court fails either to appoint separate counsel or ascertain whether the risk of conflict is too remote to require such action. *Holloway v. Arkansas*, supra, 435 U.S. at 484–89, 98 S.Ct. at 1178–1179. Notwithstanding the aforementioned, *Holloway* explicitly holds that representation of multiple defendants "is not per se violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, supra, 435 U.S. at 482, 98 S.Ct. at 1177.

■ The metamorphic process mentioned appears to have been completed, at least for the time being, in *Cuyler*. As opposed to *Glasser* and *Holloway*, the issue of representation of multiple defendants in *Cuyler* was not raised before or at trial. The Supreme Court rejected a "possible conflict" standard and held that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an *actual conflict of interest* adversely affected his lawyer's performance". (emphasis added) *Cuyler v. Sullivan*, supra, 446 U.S. at 348, 100 S.Ct. at 1718. *Cuyler* also appears to reaffirm *Holloway* in the sense that an accused who demonstrates that an actual conflict of interest "actually affected" the adequacy of counsel's representation need

not demonstrate prejudice. *Cuyler v. Sullivan*, supra, 446 U.S. at 349–50, 100 S.Ct. at 1718–1719. Pragmatically, *Cuyler* appears to advance a two-tiered standard for determining whether representation of multiple defendants is violative of an accused's Sixth Amendment right to effective assistance of counsel. First, a complaining defendant carries the burden of showing that representation of multiple defendants constituted an *actual conflict of interest.* Second, if *an actual conflict of interest* is shown a complaining defendant must go a step further and carry the burden of showing that the conflict of interest *adversely affected* counsel's performance in his representation of defendant. Support for this interpolation is found in the following language in *Cuyler*: "But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S. at 350, 100 S.Ct. at 1719.

An *"actual"* conflict of interest arising from the representation of multiple defendants in the context of the Sixth Amendment right to the effective assistance of counsel has been commonly defined, albeit in different words. In *Cuyler v. Sullivan,* supra, 446 U.S. 355, 100 S.Ct. at 1721, Justice Marshall, concurring in part and dissenting in part, took the following course: "There is a possibility of conflict, then, if the interests of the defendant may diverge at some point so as to place the attorney under inconsistent duties. There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action." See also *Commonwealth v. Michel,* 381 Mass. 447, 409 N.E.2d 1293, 1297 (1980).

■ It is appropriate to again be reminded at this juncture that representation of multiple defendants "is not per se violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas,* supra, 435 U.S. at 482, 98 S.Ct. at 1177. It is also appropriate to be re-

minded at this juncture that in reviewing the trial court's denial of defendant's motion to suppress this court, due to the trial court's superior vantage point, must defer to its assessment of the credibility of the witnesses and the weight of the evidence. *State v. Boggs,* 634 S.W.2d 447, 453 (Mo. banc 1982).

■ Due to the replacement of original counsel before the hearing on the motions to suppress and trial on the merits, and, conjunctively, the fact that the charge of ineffective assistance of counsel was raised after the "package" plea bargain agreement was struck and the controversial video-taped confession was given, this case is deemed to fall within the decisional dimensions of *Cuyler v. Sullivan,* supra. The first tier of the *Cuyler* standard for determining whether the public defender's representation of both defendant and his wife constituted an *actual conflict of interest* will now be explored. Frankly, defendant has utterly failed to demonstrate wherein or why the public defender's representation of both him and his wife constituted an "actual" conflict of interest. Speculation, conjecture and surmise will not serve to fill this void. Moreover, indulgence of speculation, conjecture and surmise as to potential conflicts which *might* arise during trial do not suffice to raise the specter of a conflict of interest, "actual" or "potential", or a divergence of interests, during the crucial time frame involved in the instant case. There is not one iota of evidence that during plea bargain negotiations a "deal" was struck to favor the wife with a lesser charge and a lighter sentence in return for her testimony against defendant. Suffice it to say, obtaining Missouri law (with certain exceptions not herein present) to the effect that neither spouse can testify against the other in a criminal case over the objection of the defendant spouse [*State v. Euell,* 583 S.W.2d 173, 174–77 (Mo. banc 1979) ] appears to erase any vestige of a conflict of interest arising from dual representation of spouses on the theory that the testimony of one might be traded off to secure a lighter sentence. Reali-

ties are being dealt with, not flightful fancies of unbridled imagination. There is no indication, directly or by innuendo, that any defenses available to the wife, if subsequently asserted, would have adversely affected defendant, or vice versa. While the facts possessed by Ronald Wood, the "broker", may have been highly suspect regarding implication of the wife, they pointed the implacable finger of guilt at defendant. Both defendant and his wife were well aware of the true nature and extent of their respective roles in the "contract" killing of the victim and both were in a uniquely favorable position to assess the veracity of what Ronald Wood told the officers in exchange for immunity from prosecution. In sum, there is ample evidence in the record to refute any suggestion that the public defender was subordinating defendant's interest to obtain a lenient sentence for the wife, or that the interests of the defendant and his wife were so divergent as to raise an *actual* conflict of interest.

Defendant's charge of a conflict of interest by reason of the public defender's dual representation of him and his wife, absent the benefit of explicative facts, cannot mature into an *actual* conflict of interest. Hence, defendant has failed to clear the first tier of the two-tier standard established in *Cuyler v. Sullivan, supra.* Despite defendant's protestation to the contrary, he was not a sacrificial lamb to the interests of his wife under the "package" plea bargain agreement. Defendant neither proved nor demonstrated an "actual" conflict of interest, or that the public defender's dual representation adversely affected performance of his representation of defendant. Actually, the second tier of the two-tiered standard laid down in *Cuyler v. Sullivan, supra,* is never reached in view of defendant's total and complete failure to prove an "actual" conflict of interest. Defendant's attempt, to minimize a life sentence without the possibility of probation or parole for fifty years in lieu of the death penalty in exchange for his acceptance of the "package" plea bargain agreement, and bootstrap it into evidence of an actual conflict of interest arising from the public defender's dual representation is unpersuasive. Defendant neither contends nor suggests that he was not fully capable of rationally weighing the various consequences open to him during the course of the "package" plea bargain negotiations, or that he entertained a genuine belief that, absent his confession, he could avoid a conviction for capital murder or, at least, escape imposition of the death penalty.[4] Defendant was a realist as far as his own fate was concerned. However, regarding the fate of his wife, the overall tone of the record suggests that defendant had a bent but quixotic sense of chivalry in view of his concern that she be charged with a lesser offense and receive a lighter sentence. The principal risk which the Sixth Amendment was designed to protect against—conviction of an innocent man—is not jeopardized or undermined by rejection of defendant's first point on appeal.

An affinity between defendant's first and second points on appeal makes it difficult to address the latter without engaging in a certain degree of redundancy. At the risk of oversimplification, defendant appears to obliquely contend by way of point (2) that failure of the public defender to prohibit him from agreeing to the "package" plea bargain agreement at such an early stage rendered the public defender guilty of ineffective assistance of counsel in violation of defendant's rights under the Sixth Amendment. The course of defendant's supportive argument seems to be that failure of the public defender to independently investigate the facts of the homicide, instead of relying on what he was told by law enforcement officials, per se violated his right to effective assistance of counsel and unconstitutionally tainted his video-taped confession. In *Strickland v. Washington,* supra, 466 U.S. at ——, 104 S.Ct. at 2064, the court concluded that "the proper standard

---

**4.** Under § 565.012.2(4), RSMo 1978, commission of capital murder "for ... another ... for the purpose of receiving money" is specifically designated as a statutory aggravating circumstance for consideration in determining whether the death penalty should be imposed.

for attorney performance is that of reasonably effective assistance" and that a complaining defendant has the burden of proving (1) that counsel's performance was deficient when measured by the applicable standard, and (2) that counsel's deficient performance prejudiced defendant. See also *Love v. State,* supra. It is also appropriate to highlight "that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington,* supra, 466 U.S. at ——, 104 S.Ct. at 2066. Also, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions" and that "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland v. Washington,* supra, 466 U.S. at ——, 104 S.Ct. at 2066.

Defendant, although quick to denigrate the public defender with charges of "sell out", "abdication of duties", "handholding representation" and a "double-dealing relationship with the prosecutor", has failed to point out any investigatory areas which, if checked out by the public defender, would have provided a defense for defendant, lowered the degree of the offense with which he was charged, or constituted mitigating circumstances. The only specific area of investigation which defendant charges the public defender was remiss in not pursuing related to some witnesses who could purportedly provide his wife with an "alibi defense." Defendant utterly fails, however, to demonstrate how an alibi defense for his wife would aid or assist him or prove ineffective assistance of counsel which adversely affected him. Moreover, the record discloses that defendant's wife dropped him off on a road near the victim's home on the fatal night in question and thereafter met him at a salvage yard in Lebanon where he spent the remainder of the night after committing the crime and burning the victim's car. No one knew the true nature and degree of the respective culpability of defendant and his wife for the heinous crime better than they.

During the course of the "package" plea bargain negotiations, which spanned a period of approximately six (6) hours, the public defender first talked with defendant and his wife, then talked with the appropriate authorities at which time he was advised of the terms of the "package" plea bargain agreement, then intermittently talked with defendant and his wife and the authorities until the "package" plea bargain agreement was finalized. The public defender advised both defendant and his wife that there was no need to rush into an agreement that day as a "preliminary hearing" and "motion hearings" would "take quite a long while." The public defender also discussed with defendant and his wife the evidence which the state had collected prior to and during their arrest, the different "kinds" of murder, the range of punishment regarding various offenses discussed, that the "death penalty" was a "very real possibility", defendant's "constitutional rights" and right to a jury trial, and, regarding defendant's wife, "the legal technicalities of accessory before and after the fact was discussed." The public defender was aware that Wood, the "broker", had a prior criminal record which, combined with the grant of immunity extended to him in return for his testimony in the homicide case, constituted "strong" grounds with which to impeach him. The public defender never advised defendant to accept or reject the "package" plea bargain agreement finally worked out, but left the decision up to defendant.

A major impasse was reached in the "package" plea bargain negotiations when, at first, the prosecuting authorities refused to reduce the capital murder charge against defendant's wife. This impasse was partially resolved when the prosecuting authorities agreed to forgo homicide charges against the wife and, instead, charge her with felony theft with a recommended sentence of ten (10) years. Defendant's concern over his wife persisted to the point that the "package" plea bargain was still unacceptable when the state

agreed to limit charges against the wife to felony theft and a recommended sentence of ten (10) years. It appears that due to the resolute position taken by the husband, the state finally agreed to a recommended sentence of seven (7) years for the felony theft charge.

■ Defendant's video-taped confession, which is under attack on constitutional grounds, was given on the evening of May 27, 1981. On several occasions before and immediately prior thereto, defendant was given a series of *"Miranda* warnings" both orally and in writing. Defendant was fully aware of his right to counsel, that he had a right to remain silent, and that anything he said might be used against him in a court of law. Defendant does not so much as suggest or intimate that he was subjected to any physical or psychological coercion, or that his confession was not freely, knowingly and voluntarily given. Defendant was capable of rationally weighing the consequences of giving the video-taped confession. His sole complaint—predicated on strained logic and highly convoluted reasoning—is that it was unconstitutionally tainted because he was deprived of effective assistance of counsel in violation of his rights under the Sixth Amendment. There is nothing in the record to suggest that the public defender breached his fealty to defendant. A prior criminal record possessed by defendant bespeaks of the fact that he was no stranger to the criminal justice system. Defendant's argument under point (2), at least in part, is notable for its ingeniousness—defendant appears to argue at times that the public defender rendered ineffective assistance because he didn't prohibit him from confessing. The right of a defendant in a criminal case to confess does not depend upon the whim or caprice of counsel as the former is not a hostage of the latter. Defendant alone was the ultimate repository of the power to decide whether or not he should confess. The human urge to confess and admit wrongdoing is not as rare as one might believe.

Pangs of conscience and remorse frequently prompt inculpatory statements of grave magnitude. Whether defendant knowingly and voluntarily confessed is not a formalistic concept—the totality of the circumstances is looked at, e.g., the role of counsel, awareness of the panoply of rights dictated by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), mental capacity to understand and appreciate the consequences of doing so, and freedom from physical or mental coercion.

■ At one point in his brief defendant states that "[s]ince a guilty plea pursuant to the plea bargain would not be able to stand in these circumstances, ... [citation of authorities omitted] it only makes sense that a confession given pursuant to the plea bargain should be suppressed as well." It appears that defendant has drawn an apt analogy because, as a practical matter, his video-taped confession was preliminary to and a part of the plea of guilty to which he had agreed.[5] As succinctly stated in *Ballard v. State,* 577 S.W.2d 932, 934 (Mo.App. 1979), "if a guilty plea is voluntarily and knowingly made counsel cannot be charged with providing ineffective assistance." The tone of the record and the arguments advanced by defendant fall considerably short of convincing this court that defendant's video-taped confession was the product of ineffective assistance of counsel and that its admission into evidence by the trial court was constitutionally impermissible under the Sixth Amendment. Although constitutional issues of great import have been raised, branding the trial court with error in admitting defendant's video-taped confession is unwarranted under either points (1) or (2) relied on by defendant. Perforce, its admission into evidence did not do violence to the Sixth Amendment.

Under point (3), defendant asserts the trial court erred in not suppressing certain items of evidence seized pursuant to a search warrant. Defendant takes the position (1) that the affidavits accompanying the "complaint" for the search warrant

---

**5.** Although defendant reneged on his agreement to plead guilty to the charge of capital murder, the state honored its part of the agreement and waived the death penalty.

were insufficient to support a finding of probable cause, and (2) the scope of the warrant was overly broad, all in violation of defendant's rights under the Fourth and Fourteenth Amendments of the Constitution of the United States.

■ Two affidavits were submitted in support of the "complaint" which resulted in issuance of the search warrant in question. One affidavit was subscribed to by Paul J. Mertens, a veteran highway patrolman, who had participated in the interrogation of Ronald Wood, the "broker", prior to making application for the search warrant in question. The other affidavit was subscribed to by Ralph C. Roark, another veteran highway patrolman, who was the first person to arrive at the scene of the homicide. Defendant faults the supporting affidavits for failing to embody sufficiently detailed information to demonstrate the basis for the informants' knowledge and credibility. Defendant dogmatically insists that the "complaint" and supporting affidavits were insufficient to establish probable cause for issuance of the search warrant under both prongs of the two-pronged test ("basis of knowledge prong" and "veracity prong") established in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Although reluctantly conceding that the Supreme Court abandoned the two-pronged *Aguilar-Spinelli* test for determining whether probable cause has been established for issuance of a search warrant, and substituted in its place a "totality of the circumstances" approach, *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), defendant steadfastly insists that under any approach the warrant in question should not have issued. The supporting affidavits, although setting forth detailed, intimate facts concerning defendant's participation in the homicide and the arrangements worked out between Wood and defendant, do, admittedly, stop an infinitesimal distance short of technically meeting the stringent two-pronged *Aguilar-Spinelli* test for determining the exist-

ence of probable cause for issuance of the search warrant.

Essentially the same affidavit infirmities were encountered in the more recent case of *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), which appears to have added an additional dimension to the *Gates* "totality of the circumstances" test by what is generally referred to as the "good-faith exception" to the Fourth Amendment exclusionary rule. The Supreme Court departed from rigid application of the exclusionary rule on the firm belief that "when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants [by reason of strict application of the exclusionary rule] offends basic concepts of the criminal justice system." *United States v. Leon*, supra, —— U.S. at ——, 104 S.Ct. at 3413. Factually, the subscribing officers in the instant case set forth in their respective affidavits detailed, intimate facts which had been collectively gathered over a period of several days of intensive investigation. The search warrant was issued by an associate circuit judge at approximately 2:00 a.m. on the morning of May 21, 1981. Thereafter, an outstanding warrant for the arrest of defendant and his wife was served about 5:15 a.m. on the morning of May 21, 1981, on a public highway a short distance south of Bourbon, Missouri, by members of the Missouri State Highway Patrol. Defendant, with his wife as a passenger, was driving a 1971 American Motors station wagon which was particularly described by vehicle identification and license numbers in both the "complaint" and ensuing search warrant. While defendant and his wife were in the process of being arrested, at which time they were both given a *Miranda* warning, a sheriff arrived at the scene with the search warrant. The sheriff gave another *Miranda* warning to defendant and his wife and then proceeded to read the search warrant to them before undertaking a search of the American Motors station wagon. During the course of reading the search warrant to them, defendant advised

the sheriff that the "gun" he was "looking for" was "in the car in the paper bag behind the driver's seat." The "gun" referred to was identified as the murder weapon and the one taken from the victim's home. The brown paper bag contained other items, also covered by the search warrant, which had been taken from the victim's home. The sheriff then went to the residence of defendant and his wife to execute the warrant at that locale.

Defendant attempts to attribute some sinister motive to the fact that the search warrant was issued at 2:00 a.m. in the morning. The fact that the officers rousted an associate circuit judge out at that hour of the morning indicates that they were consciously aware of the proscription of the Fourth Amendment, and were endeavoring to act in a lawful manner. Moreover, the conduct of the subscribing officers, as well as the sheriff who executed the search warrant, was, throughout, indicative of officers with a sense of duty and responsibility regarding the constitutional prohibition against unreasonable searches and seizures. No bullying tactics or breaking of doors was engaged in by the officers, nor did they deliberately or maliciously engage in any false statements; to the contrary, their conduct throughout demonstrated a high sense of duty and responsibility. The aforementioned is significant as the "good faith exception" explicated in *United States v. Leon*, supra, does not indiscriminately do away with the requirement of probable cause for issuance of a search warrant. Inquiry into knowing or reckless falsity of an affidavit, abandonment of a "neutral and detached" judicial role by an issuing magistrate, and reliance on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable", are not swept into oblivion under the "good faith exception". *United States v. Leon*, — U.S. at —, 104 S.Ct. at 3417, 3422. The "good faith exception", however, when applicable, recognizes that officers who have acted with objective good faith have a right to rely upon an issuing magistrate's determination that a substantial basis existed for finding probable cause. When the facts of this case are juxtaposed with the logic and rationale supporting the holding in *United States v. Leon*, supra, this court entertains no qualms in holding that the trial court in the instant case did not err in refusing to suppress the evidentiary items in question.

Before concluding disposition of point (3), mention is made of the fact that defendant vigorously contends that the language "together with any and all motor vehicles located at said residence [referring to defendant's place of residence which was described with particularity]" contained in the search warrant, was overly broad and violated the "particularity" requirement of the Fourth Amendment regarding the place authorized to be searched. Emphasis is placed upon the fact that the warrant additionally described defendant's 1971 American Motors station wagon by identification and license numbers, and the only motor vehicle searched under the warrant, or otherwise, was the American Motors station wagon. It is patent that the "particularity" requirement of the Fourth Amendment is to preclude broad, general searches that know no bounds or limits and which inherently smack of unreasonableness. See generally *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), and *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). It is axiomatic that the Fourth Amendment was never intended to license prosecuting authorities to engage in unbridled "fishing expeditions". Practical accuracy in description governs over technical precision, *United States v. Williams*, 687 F.2d 290, 292 (9th Cir.1982), and the particularity requirement is met if a description is sufficiently definite to enable an executing officer to reasonably identify the place to be searched. *Steele v. United States*, 267 U.S. 498, 503–04, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925). Notwithstanding the aforementioned, the fact that the search was limited to defendant's 1971 American Motors station wagon and residence, both of which were described

with sufficient particularity to meet the most stringent test of specificity, conjoined with the "good faith exception" laid down in *United States v. Leon,* supra, convinces this court that the lack of "particularity" complained of by defendant utterly fails to justify application of the exclusionary rule.

Perforce, the trial court did not err in overruling defendant's motion to suppress the various evidentiary items seized pursuant to the search warrant and point (3) relied on by defendant is denied in toto.

■■ Defendant's fourth and final point complains of error on the part of the trial judge in overruling defendant's objection to testimony of Ronald Wood, the "broker", concerning conversations with the victim's stepson before the formation of a conspiracy to "do away" with the victim. The state purported to justify admission of the testimony on the ground that extrajudicial statements of a co-conspirator are an exception to the hearsay rule. The state's purported justification is misplaced as evidenced by *State v. Rayner,* 549 S.W.2d 128, 131 (Mo.App.1977): "The following principle, beyond any semblance of doubt or peradventure, prevails in this state: '[I]f the declaration of a co-conspirator or co-actor sought to be shown in evidence is not in furtherance of the object of the unlawful combination, *or if it was made prior to the formation thereof* ... such declaration is hearsay ... and not binding upon the co-conspirator or co-actor on trial ...' " (emphasis added) This does not, however, put the matter to rest favorably to defendant. Whether admission of the objectionable evidence constituted harmless error is a separate determination in and of itself. The standard for determining whether error in the admission of evidence is harmless appears to be unsettled in this state. One line of authority holds that "error in the admission of evidence should not be declared harmless unless it is so without question." *State v. Degraffenreid,* 477 S.W.2d 57, 64 (Mo. banc 1972). See also *State v. Wright,* 582 S.W.2d 275, 277 (Mo. banc 1979). On the other hand, the majority opinion in *State v. Miller,* 650 S.W.2d 619, 621 (Mo. banc 1983), without purporting to overrule *State v. Degraffenreid,* supra, and *State v. Miller,* supra, holds that "[t]he more understandable and prevailing standard is that error can be declared harmless only if we are 'able to declare a belief that it was harmless beyond a reasonable doubt.'" The inexorable impact of defendant's video-taped confession and possession of the various evidentiary items complained of, all of which were properly admitted in evidence, destroys any claim that prejudice attached to admission of the controversial testimony. Defendant's charge of prejudice anent all the other evidence against him defies recognition in a judicial sense and is relegated to harmless error. Defendant's fourth and final point affords no basis for relief.

Judgment affirmed.

All concur.