STATE of Missouri,
Plaintiff-Respondent,

v.

Freddie CUMMINGS,
Defendant-Appellant.

No. 14017.

Missouri Court of Appeals,
Southern District,
Division One.

July 17, 1986.

Motion for Rehearing or to Transfer
Denied Aug. 8, 1986.

Application to Transfer Denied
Sept. 16, 1986.

M. Elise Branyan, Asst. Public Defender, Springfield, for defendant-appellant.

William L. Webster, Atty. Gen., Kevin B. Behrndt and John M. Morris, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Judge.

A jury found defendant Freddie Cummings guilty of receiving stolen property, § 570.080,[1] and he was sentenced, as a

---

1. All references to statutes are to RSMo 1978, V.A.M.S.

prior offender, to five years' imprisonment. Defendant appeals.

The information was in two counts but the state dismissed Count II at the close of the evidence. Count I, on which the verdict was based, charged that the defendant, on January 4, 1984, in Greene County, "with the purpose to deprive the owner of one Peterbilt tractor, VIN # 1XP9D29X9EN162094, kept such property, of a value of at least $150, knowing or believing that it had been stolen." Count I also pleaded a prior felony conviction.

Defendant's first point is that the trial court erred in failing to sustain defendant's motion to suppress evidence, primarily the stolen tractor, which was seized pursuant to a search warrant executed at defendant's residence on Farm Road 116 in Greene County on January 4, 1984, the date of the offense. Defendant challenges the warrant's description of the place to be searched.

The warrant was issued on January 4, 1984, by Judge Thomas K. McGuire, Jr., an associate circuit judge of the Circuit Court of Greene County. The warrant, which was on Supreme Court Form No. 39(A) (Missouri Rules of Court, Seventeenth Edition, 1986, p. 207), contained this recital:

"WHEREAS a complaint in writing, duly verified by oath, has been filed with the undersigned Judge of this court, stating that heretofore the following described personal property, to-wit: 1–1984 PETERBILT VIN/1XP9D29X9EN162094 BLUE AND WHITE TRACTOR OR PARTS THEREOF of the goods and chattels of LISA MOTOR LINES, FT. WORTH, TEXAS has been unlawfully stolen, and it further appears from the allegations of said complaint that said property is being kept or held in this county and state at and in A METAL BUILDING, BOX TRAILERS, STORAGE BINS OR VEHICLES. LOCATED ON FR. 116 SECOND HOUSE EAST OF LACOMPTE ROAD, NORTH SIDE."

Defendant's criticism of the description of the place to be searched is:

"The instant search warrant is for the metal building, box trailers, storage bins, or vehicles located on Farm Road 116, *second* house east of LaCompte Road, north side. The evidence presented to the trial court in the Motion to Suppress, was clear that the Cummings residence was the *third* house, east of LaCompte Road on the north side." (Emphasis added.)

Circumstances leading up to the execution of the warrant must be set forth. The officer who applied for the warrant was Greene County Deputy Sheriff Ivan Johnson. On October 26, 1983, Johnson was working with F.B.I. Agent Ben Cagle. The officers "were checking information on a chop shop located in Greene County at the northeast corner of the property occupied by [defendant] Freddie Cummings." Deputy Johnson saw a blue and white trailer sitting in a metal building and took a photograph of the vehicle. On that date, according to Johnson, "at this time I could not find where the vehicle had been stolen from. Ben Cagle had information a vehicle was going to be stolen and retagged. Cagle [later] obtained information as to where the vehicle was stolen."

On October 30, 1983, a reliable informant informed Agent Cagle that defendant Cummings and one Bogle "are currently involved in cutting up stolen truck tractors and passenger vehicles at a large metal building located on Cummings' property." The informant also told Cagle that Bogle "recently stole a 1984 Peterbilt tractor and Bogle and Cummings plan to 'retag' this tractor making it a 1982 Peterbilt using a salvage Vehicle Identification Number and sell it at the Taylor & Martin Auction in Nebraska."

On November 2, 1983, another reliable informant informed Agent Cagle that Bogle and defendant "are chopping and retagging stolen truck trailers using the large metal building on Cummings' property and Bogle plans to have a stolen tractor retagged and ready to sell at the next Taylor & Martin Auction in Nebraska."

On November 16, 1983, Agent Cagle "had a check run through the National Crime Information Center for stolen 1984 Peterbilt tractors. Up to November 16, 1983, only three 1984 Peterbilt tractors had been stolen nationwide, and one was stolen on October 7, 1983 in Ft. Worth, Texas. The vehicle identification of this tractor is 1XP9D2X9EN162094 and it is blue and white. The 1984 Peterbilt tractor was stolen from Lisa Motor Lines, Ft. Worth, Texas."

On November 16 (sic), 1983, Lewis Munday, Vice President, Taylor & Martin Auction, Fremont, Nebraska, informed Agent Cagle that Bogle "was to bring a 1982 Peterbilt tractor to his auction on November 17, 1983 at Omaha, Nebraska but did not." Munday also told Cagle that "[Munday's] office was in telephonic contact with Bogle, and Bogle told them prior to the auction date that he was working on the 1982 Peterbilt tractor and may not finish in time for the auction."

On November 28, 1983, the first informant told Agent Cagle "that Bogle had retagged the previously mentioned 1984 Peterbilt tractor, making it a 1982 Peterbilt tractor, but did not sell it at the Taylor & Martin Auction as planned." This informant also told Cagle that "the 1984 Peterbilt tractor was stolen by Bogle several weeks before in Texas."

On January 3, 1984, the second informant told Agent Cagle "that the Peterbilt tractor that Bogle was to sell at the Taylor & Martin Auction in Nebraska has never been sold and is still located in the large metal building located on the property of Freddie Cummings."

On January 4, 1984, Deputy Johnson applied for the search warrant. Johnson's verified application set forth the events of October 26, 1983. Attached to the application, and incorporated in it by reference, were the separate affidavits of Johnson (again describing the events of October 26, 1983), and Agent Cagle (setting forth the information Cagle had received on October 30, November 2, November 16 and November 28, 1983, and January 3, 1984). The warrant was issued containing the challenged description of the place to be searched.

The circumstances surrounding the execution of the warrant are set forth in the testimony of Deputy Johnson at the hearing on the motion to suppress. Johnson, who was called by the prosecutor and who was the only witness who testified at the hearing, testified as follows:

"I served the search warrant on January 4, 1984. State's Exhibit 2 is my affidavit to search for a stolen tractor. The affidavit pertains to where I saw a blue and white tractor sitting in a metal building at the rear of Cummings' house. On October 26, 1983, I saw this tractor inside this metal building. The description of the place to be searched, contained in the search warrant, is not correct. The problem with it is that it is the third house instead of the second house. I served that warrant. The inaccurate description was not so defective that I could not serve the warrant on the right location or find the right property because the second house did not have the metal storage building behind it. In the past I had been at this particular property, at the third house, but I had not paid attention that it was the third house. After you went by some bales of hay it was easy to see the second house. When I pulled into Mr. Cummings' driveway I immediately knew it was the third house instead of the second."

"I could tell the difference because the second house did not have the metal building behind it. I had been watching the metal building behind Mr. Cummings' house taking photographs. There were vehicles at the second house but there were no box trailers at the rear of the second house."

"I had been keeping Mr. Cummings' property under surveillance. I had been keeping the metal building under surveillance. I had no trouble at all in finding the property intended to be searched."

"I did not have a search warrant that said search this particular property, I

had the wrong house. I made an error on the second house but I did know which house I wanted to search."

When Deputy Johnson executed the search warrant he was accompanied by Agent Cagle and other officers. The group, who did not search Cummings' house, searched the metal building and seized the stolen tractor which they found inside. The tractor appeared to be in the process of being painted and the cab was apparently being altered.

In challenging the warrant's description of the place to be searched, defendant relies on these constitutional and statutory provisions:

" ... and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched...." Fourth Amendment, U.S. Const.; " ... and no warrant to search any place, ... shall issue without describing the place to be searched ... as nearly as may be." Art. 1, § 15, Mo. Const.; "The search warrant shall: ... 5. identify the person, place or thing which is to be searched, in sufficient detail and particularity that the officer executing the warrant can readily ascertain whom or what he is to search." § 542.276.6; "A search warrant shall be deemed invalid ... (5) if it does not describe the person, place or thing to be searched ... with sufficient certainty." § 542.276.10.

The Missouri Supreme Court has said that Art. 1, § 15 of the Missouri Constitution provides "essentially the same protections found" in the Fourth Amendment, and that an analysis of a defendant's "Fourth Amendment claim" applies "with equal force" to his claim under the Missouri Constitution. *State v. Sweeney,* 701 S.W.2d 420, 425, n. 4 (Mo. banc 1985).

With regard to the adequacy of the description of the place to be searched, the Supreme Court of the United States has said: "It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v.*

*United States,* 267 U.S. 498, 503, 45 S.Ct. 414, 416[2], 69 L.Ed. 757 (1925).

"The test for determining the sufficiency of the description of the place to be searched is whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort, and *whether there is any reasonable probability that another premise might be mistakenly searched."* (Emphasis added.) *Lyons v. Robinson,* 783 F.2d 737, 738 (8th Cir.1985). The same language is found in *United States v. Turner,* 770 F.2d 1508, 1510 (9th Cir.1985); *United States v. Clement,* 747 F.2d 460, 461 (8th Cir.1984); *United States v. McCain,* 677 F.2d 657, 660 (8th Cir.1982).

The particularity requirement of the Fourth Amendment protects the right to be free from unbounded general searches. It ensures that nothing is left to the discretion of the officer executing the warrant. *United States v. Williams,* 687 F.2d 290, 292 (9th Cir.1982).

"The prime purpose of the 4th Amendment is to assure that the people will 'be secure in their persons, houses, papers, and effects from intrusion and seizure by officers acting under the unbridled authority of a general warrant.' *Stanford v. State of Texas,* 379 U.S. [476] 481, 85 S.Ct. 506, 510, 13 L.Ed.2d 431 (1965). To that end the 4th Amendment provides, inter alia, that the place to be searched shall be particularly described. The test of the unreasonableness of a search cannot be stated in rigid and absolute terms. Each case is to be decided on its own facts and circumstances. *Harris v. United States,* 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1946)." *State v. Daniels,* [46 N.J. 428] 217 A.2d 610, 614 (N.J.1966).

■ Practical accuracy rather than technical precision governs in determining whether a search warrant adequately describes the premises to be searched. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965).

To similar effect see *United States v. Johnson*, 541 F.2d 1311, 1313 (8th Cir. 1976); *State v. Murphy*, 693 S.W.2d 255, 266 (Mo.App.1985). The validity of a search warrant is to be interpreted in a "commonsense and realistic fashion." *United States v. Shropshire*, 498 F.2d 137, 142 (6th Cir.1974). "[A] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." *United States v. Ventresca*, supra, 380 U.S. at 108, 85 S.Ct. at 746, 13 L.Ed.2d 684.

In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court modified the Fourth Amendment exclusionary rule "so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." In the instant case defendant Cummings, understandably, does not challenge the existence of probable cause to support the challenged warrant and *Leon* is factually distinguishable. Nevertheless, some of the rationale expressed in *Leon* merits mention.

"The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure work[s] no new Fourth Amendment wrong. The wrong condemned by the Amendment is fully accomplished by the unlawful search or seizure itself, and the exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered." *Leon*, supra, 104 S.Ct. at 3412.

"The exclusionary rule operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the person aggrieved." Id. at 3412.

Particularly when law enforcement officers have acted "in objective good faith or their transgressions have been minor, the magnitude of the benefit [of the exclusionary rule] conferred on such guilty defendants offends basic concepts of the criminal justice system." Id. at 3413. The application of the exclusionary rule "has been restricted to those areas where its remedial objectives are thought most efficaciously served." Id. at 3413. On the other hand, where a Fourth Amendment violation "has been substantial and deliberate," the court "has not seriously questioned ... the continued application of the rule." Id. at 3413.

"[T]he exclusionary rule is designed to deter *police misconduct* rather than to punish the errors of judges and magistrates." Id. at 3418. (Emphasis added).

"The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official conduct was pursued in complete good faith, however, the deterrence rationale loses much of its force." Id. at 3419.

"If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Id. at 3419–20.

Nevertheless, the officers' reliance on "the technical sufficiency" of the warrant must be "objectively reasonable" and in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued. Id. at 3421.

"*[D]epending on the circumstances of the particular case,* a warrant may be so *facially deficient*—i.e., in failing to par-

ticularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Id. at 3422. (Emphasis added.)

In *United States v. Johnson,* supra, 541 F.2d at 1314 the court said: "Repeatedly, search warrants with minor errors in the description of the structure to be searched have been held valid so long as the executing officer exerting reasonable effort could identify the site intended."

The courts have frequently pointed out that where the officer who executed the warrant is the same officer who applied for it, a mistaken search is unlikely. *Lyons v. Robinson,* supra, 783 F.2d at 738; *United States v. Turner,* supra, 770 F.2d at 1511; *United States v. McCain,* supra, 677 F.2d at 661. To similar effect see *State v. Walsh,* 19 N.C.App. 420, 199 S.E.2d 38, 40 (1973), and *State v. Ockman,* 466 So.2d 658, 659[1] (La.App.1985). In determining the significance of an inaccuracy in a warrant's description of the place to be searched, the courts have noted the fact that the place was the subject of prior surveillance. *United States v. Turner,* supra, at 1511; *United States v. McCain,* supra, at 661; *United States v. Gitcho,* 601 F.2d 369, 371 (8th Cir.1979).

"Where one part of the description of the premises to be searched is inaccurate, but the description has other parts which identify the place to be searched with particularity, searches pursuant to such warrants have been routinely upheld." *United States v. Gitcho,* supra, at 371.

Cases upholding warrants containing the wrong address of the place to be searched but also containing other descriptive material sufficient to identify it include *Lyons v. Robinson,* supra; *United States v. Turner,* supra; *United States v. Clement,* supra; *United States v. Williams,* supra; *United States v. McCain,* supra; *United States v. Gitcho,* supra; *Chambless v. State,* 165 Ga.App. 194, 300 S.E.2d 201, 202[2] (1983); *State v. Hart,* 100 Idaho 137, 594 P.2d 647 (1979); *People v. Watson,* 26 Ill.2d 203, 186 N.E.2d 326 (1962); *State v.*

*Feemster,* 628 S.W.2d 367 (Mo.App.1982); *State v. Walsh,* supra, *State v. Daniels,* supra; *Feagins v. State,* 596 S.W.2d 108 (Tenn.Crim.App.1979); and *State v. Trasvina,* 16 Wash.App. 519, 557 P.2d 368 (1976).

In *United States v. Clement,* supra, 747 F.2d at 461 the court said:

"Among the factors we have relied upon in upholding searches conducted under the authority of a warrant inaccurately describing the place to be searched are: (1) whether the address in the warrant, although incorrect, still describes the same piece of property; (2) whether the premises intended to be searched are adjacent to those described and are all under the control of the defendant; and (3) whether other parts of the description which are correct limit the place to be searched to one place. Id. Of particular importance in *Gitcho* was the fact that the agents personally knew which premises were intended to be searched."

With regard to warrants authorizing the search of rural property, the Missouri Supreme Court has said:

"It seems neither necessary nor practical to describe a farm dwelling house in a search warrant with the same degree of particularity as a dwelling house located in a city, town, or village where different families live in the same house and in adjoining houses, and where houses may be definitely described by street numbers or by other marks of identification." *State v. Stough,* 2 S.W.2d 767, 770 (Mo. 1928). See also 79 C.J.S. Searches and Seizures, § 81b(5), p. 894; 68 Am.Jur.2d Searches and Seizures, § 76, p. 730. In *United States v. Williams,* supra, 687 F.2d at 293 the court said: "The necessary specificity of the description will differ as between urban and rural areas and depends heavily upon the factual circumstances of each case."

In *State v. Buchanan,* 432 S.W.2d 342 (Mo.1968), on which defendant places his primary reliance, a shotgun was seized in the course of a search under a warrant which authorized the search of "310 N. Hocker." The place actually searched was

"314 N. Hocker." Although the complaint requesting the warrant contained (in addition to the wrong street address) the description, "One-story frame building with outbuildings," the latter language did not appear in the warrant itself. The warrant was held to be defective and the trial court erred in admitting the fruits of the search.

In *State v. Feemster,* supra, 628 S.W.2d 367, on which the state primarily relies, the warrant authorized a search at "4451 St. Ferdinand," but the warrant also "described the building, its door, and the location of the residence in specific detail." The police went to 4453 St. Ferdinand and, while there for the purpose of executing the warrant, a gun battle took place with defendant and his brother. The court of appeals upheld the warrant and distinguished *Buchanan.* In *Buchanan* "there was no other apparent description of the premises other than the wrong address, and the police had no previous knowledge of the premises from an informant or prior surveillance." *Feemster,* at 370.

Also at p. 370 the court said:

"The officers in this proceeding could clearly identify the property to be searched 'in sufficient detail and particularity that the officer[s] executing the warrant' could readily ascertain it and thus comport with [§ 542.276.6(5)] pertaining to search warrants.

The facts of this case parallel those in *United States v. Gitcho,* 601 F.2d 369 (8th Cir.), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979), upholding a search warrant for 4144 Geraldine in St. Louis County, whereas the address of the premises to be searched was 4146 Geraldine. In *Gitcho,* as in this case, police had the property at the 4146 address under surveillance and the premises intended to be searched were those actually searched. In *Gitcho* the 8th Circuit found the search warrant valid despite the fact that it was technically incorrect as it 'was reasonable for the location intended,' and the evil of search of a mistaken premises was not reasonably probable."

In *State v. Varvil,* 686 S.W.2d 507 (Mo. App.1985), defendant owned a tract of land on which two buildings, building A and building B, were situated. A search warrant authorized a search for a 1977 Camaro located in building B. The officers searched building B and found the 1977 Camaro. Believing the warrant covered both buildings, the officers broke into building A and found a 1973 Camaro. Defendant was found guilty of receiving stolen property, the 1973 Camaro.

In invalidating the search of building A, the court of appeals pointed out that the warrant described only building B and that the search of building A could not be justified under the "good faith exception" in *Leon.* The court also noted that the officers learned "shortly after the search began" that the warrant covered only building B. At p. 511 the court said:

"Three officers testified in this case that they learned shortly after the search began that the warrant covered only building B, but that they had thought prior to the start of the search that it covered both buildings. The mistake was theirs, not the judge's. Since the officers readily learned of the warrant's limits after the search had started, it is clear that there was an opportunity to learn of the limits prior to the search. 'In order for a warrant's limitations to be effective, those conducting the search must have read or been adequately apprised of its terms.' *United States v. Heldt,* 668 F.2d [1238 (D.C.Cir.)] at 1261."

Although not cited by either party, *Finch v. State,* 479 So.2d 1314 (Ala.Crim. App.1985), deserves mention. There a search warrant was issued for the search of the premises at 317 West Watts Street, Enterprise, Alabama. The place actually searched was defendant's residence at 313 West Watts Street. The officer who executed the warrant knew the defendant's address but erroneously advised the issuing magistrate that the address was 317 West Watts. The erroneous street address

was the *only* description of the place to be searched which the warrant contained.

In invalidating the search for the reason of the improper description, the court said that the inaccuracy of the address was due to the mental error of the officer, and not an error on the part of the issuing magistrate, and that the good faith exception of *Leon* did not apply. The court also said, at p. 1320, that an additional fact invalidating the search was "that the officer *knew* that he was going to conduct a search of a house that was not authorized to be searched by the warrant he was to execute; he intentionally and not mistakenly executed a search warrant at 'a place other than the place intended by the magistrate.'" (Emphasis in original.)

■ The warrant in the case at bar did not authorize the search of the "second house" referred to in the warrant, and the "second house" was not searched. The warrant authorized the search of "a metal building, box trailers, storage bins or vehicles, located on FR 116, second house east of LaCompte Road, east side." Properly "third house" instead of "second house" should have been used, but the thing which was searched was the metal building. Before making that search Deputy Johnson was aware of the error, but the fact is that the second house did not have a metal building nor were there "box trailers" at the second house as there were at the third house, although there were vehicles at both houses. Only the third house, and not the second house, had the combination of "a metal building, box trailers, storage bins or vehicles." Also significant is the fact that the same metal building which was searched had been under prior surveillance by the same officers who executed the warrant.

Deputy Johnson's realization of the error did not result in a change in the place to be searched. The metal building was the place to be searched, the place which was searched, and the place which the issuing judge intended to be searched. The place to be searched was "described with sufficient particularity as to enable the execu-

ting officer to locate and identify the premises with reasonable effort," *Steele v. United States,* supra, 45 S.Ct. at 416, and there was no "reasonable probability that another premise might be mistakenly searched." Id. Defendant's first point has no merit.

Defendant's second point is that the trial court erred in receiving into evidence, over defendant's objection, portions of the testimony of F.B.I. Agent Ben Cagle concerning "retagging operations." In general, defendant's position is that the challenged evidence was not the proper subject of expert testimony, referred "to crimes for which defendant was not on trial," and was not material. Defendant also argues that the state failed to establish that Cagle was an expert on "retagging operations."

Cagle testified that he had been employed with the F.B.I. for over 13 years and that most of his career "was general property crimes"—"cases involving stolen property." For the last two years he had worked only "car cases" and for the past year he had been working "on nothing but over-the-road tractor cases."

Cagle testified, "I received special training in the areas of stolen property, stolen tractors, and VIN numbers (vehicle identification numbers) and tracing VIN numbers. I have attended in-service training put on by experts to qualify me to teach on the subject. Next month I am going to teach a class of officers in Topeka, Kansas on the subject of retagging. I have been to classes in Quantico, Virginia where I was taught by experts to be an instructor so I could instruct on how the retagging process works, how to trace VIN numbers, how to lift them, to come up with true vehicle identification numbers from stolen tractors and cars. I am a member of the International Automobile Association where we receive material keeping us up-to-date on any new processes or methods that tractor thieves or automobile thieves have."

Cagle testified that "a retagging operation" could be conducted in several ways, including cutting up a vehicle and selling the parts, or removing all identification

numbers from the vehicle and "retagging" it by use of a counterfeit title. He further testified that retagging may involve changing the outward appearance of the vehicle by repainting it. "If the vehicle has a lot of chrome you would take a lot of chrome off; if it had no chrome you would put a lot of chrome on; if it had a sleeper you might remove the sleeper; if it had no sleeper you would put one on; if it had a small sleeper you would replace it with a large sleeper."

Cagle further testified that on January 4, 1984, he saw the Peterbilt 1984 tractor at the metal building on Cummings' property. The chrome had been stripped off and the tractor was ready to paint. The sleeper had been "moved back from the cab." The identification numbers had been removed from the tractor except for a number on the engine. Most of the serial numbers had been removed from the frame and cab and sleeper. "I did find identification numbers concealed in the cab, confidential numbers, to trace that to the Peterbilt in Texas. Based on my experience and training in the area of stolen property, and specifically retagging operations, it is my opinion that this particular tractor was being readied to be retagged and sold to the public."

█ An expert may testify as to his opinion on an ultimate issue in a criminal case but the evidence must aid the jury and it must not invade the province of a jury. The expert opinion testimony should not be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved. *State v. Taylor*, 663 S.W.2d 235, 239 (Mo. banc 1984). It is within the trial court's sound discretion whether to admit an expert's testimony. Id. at 239; *State v. White*, 621 S.W.2d 287, 292 (Mo.1981).

In *State v. Saussele*, 265 S.W.2d 290, 296[14] (Mo. banc 1954), where defendant was tried for bookmaking, police officers were allowed to testify as experts on a wide range of aspects of the modus operandi of what a bookmaker does, the use of the telephone in laying off bets, and what devices are used to record bets. In holding the evidence admissible, the supreme court rejected defendant's argument that the evidence was not a proper subject of expert testimony and invaded the province of the jury. The court noted that the officers had years of experience on the gambling squad, had participated in many arrests in that field, had discussed the subjects with many bookmakers and had studied material on the subjects.

At pp. 296–297 the court said:

"We think this was a subject about which jurors who had not participated in this kind of activity would not have the same essential knowledge and was a proper subject for expert testimony. The officers qualifications were amply shown and their testimony was based upon customs of bookmakers and the usual manner in which they operated."

A case upholding the admissibility of testimony remarkably similar to that of Agent Cagle is *State v. Oldaker*, 304 S.E.2d 843, 848[4] (W.Va.1983), where defendant was tried on a similar charge. Other authorities generally upholding the admissibility of this type of testimony include *United States v. Maher*, 645 F.2d 780, 783[8] (9th Cir.1981); *United States v. McCoy*, 539 F.2d 1050, 1062–1065[18–21] (5th Cir.1976); *United States v. Sellaro*, 514 F.2d 114, 118–119[2, 3] (8th Cir.1973); *Spinelli v. United States*, 382 F.2d 871, 892[42] (8th Cir.1967); *State v. Salazar*, 27 Ariz.App. 620, 557 P.2d 552, 557[6–9] (1976); *State v. Gervais*, 394 A.2d 1183, 1187–1188[4–6] (Me.1978); *Watson v. State*, 94 Nev. 261, 578 P.2d 753, 756[5] (1978); Anno. 31 A.L.R. 4th 798 (Admissibility of Expert Testimony as to Modus Operandi of Crime); 31 Am.Jur.2d Expert and Opin.Evid., § 180, p. 742. But see *People v. Raco*, 68 A.D.2d 258, 416 N.Y.S.2d 849 (1979).

█ This court holds that the trial court did not abuse its discretion in accepting Agent Cagle as an expert on retagging operations and in receiving the challenged evidence which was material on the issue of defendant's knowledge that the tractor

was stolen. Defendant's second point has no merit.

Defendant's third point is that the trial court erred in permitting the state to make a late endorsement of the information so as to add Patsi Moody as a state's witness and to permit her to testify. Her testimony dealt only with Count II which was dismissed at the close of the evidence. Defendant's third point has no merit.

The judgment is affirmed.

TITUS, P.J. and GREENE, J., concur.