STATE of Missouri, Respondent,

v.

Benigno R. GONZALES, Appellant.

No. WD 33633.

Missouri Court of Appeals,
Western District.

April 12, 1983.
Motion for Rehearing and/or Transfer to
Supreme Court Denied
May 31, 1983.

See also 654 S.W.2d 117.

Fred Duchardt, Liberty, for appellant.

John Ashcroft, Atty. Gen. and Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

Before DIXON, P.J., and KENNEDY and LOWENSTEIN, JJ.

KENNEDY, Judge.

Defendant Benigno R. Gonzales was convicted upon jury trial of first-degree assault upon Kansas City Police Officer Larry Lewis. In accordance with the jury verdict he was sentenced to 15 years' imprisonment. He appeals to this court.[1]

We reverse and remand for a new trial.

The facts are as follows:

A little before 2 o'clock a.m. on June 1, 1981, Highway Patrolman Frank Coley was driving along Highway I–35 in Clay County in his patrol car when bright lights reflected in his rearview mirror drew his attention to a car following him. He pulled off on the shoulder of the highway, waited for the car to pass, then fell in behind it. The car, a 1977 silver-grey Lincoln with four occupants, was traveling at 37 miles per hour. The minimum legal speed limit was 40 miles per hour. Highway Patrolman Coley turned on his red lights as a signal for the Lincoln to pull over and stop. The Lincoln took an exit ramp off the highway at Davidson Road exit and came to a stop. The driver proved to be defendant Gonzales. Officer Coley suspected he was intoxicated, and required him to get out of his car and take a field sobriety test. Defendant's unsteady and uncoordinated performance on the field sobriety test, as well as his slurred speech and the odor of alcohol, seemed to confirm Officer Coley's suspicion. He undertook to place Gonzales under arrest. An altercation ensued. As the officer was struggling with Gonzales, Gonzales called to a companion, who was still in the car, to help him. The companion started to get out of the car. Officer Coley momentarily released defendant from his grasp in order to get his nightstick from his car and to radio for assistance. Gonzales took advantage of the respite to leap into his car and speed away.

A chase of Hollywood dimensions began. The Lincoln sped through the highways and streets of North Kansas City at furious speeds, oblivious of traffic signals. Coley in his highway patrol car was in headlong pursuit, red lights flashing and siren in full voice.

From where the altercation and attempted arrest had taken place, the Lincoln returned to southbound I–29. Taking the Parvin Road exit off I–35, it failed to negotiate a sharp turn in the exit ramp, drove onto an island and came to a stop. Coley brought his patrol car to a stop directly behind the Lincoln, but was forced to put it in reverse at once and to back up to avoid being struck when the Lincoln began backing toward him. The Lincoln got back on the roadway and resumed its forward course.

Immediately after it turned right on Parvin Road, the Lincoln turned off Parvin Road at the I–35 exit designated for traffic intending to go north on I–35. When it reached I–35, though, it turned the wrong way and drove south in the northbound lanes at the rate of 90 miles per hour. The highway patrol car was clinging to its rear. When the two speeding cars reached a point about one-half mile north of the Armour

<hr />

1. Defendant was tried also and convicted for resisting arrest in the same trial. The appeal of that conviction is pending before us in a separate case.

Road exit, the Lincoln brakes suddenly, causing Coley to apply his brakes sharply to avoid striking it. The Lincoln made a U-turn and headed north along Highway I–35.

The alleged assault took place as the Lincoln left I–35 at the Parvin Road exit.

Kansas City Police Officer Larry Lewis, patrolling in the area in his police car, had learned via his police radio of the northward chase along I–35. Lewis had driven from Parvin Road onto the I–35 entrance ramp. As one drives off Parvin Road onto the I–35 northbound entrance ramp, it was explained, the ramp for some short distance serves both as an entrance ramp and an exit ramp, the lanes separated by a double yellow line painted in the middle. Nearer I–35 the lanes separate, the entering traffic executing a hairpin curve to enter the flow of northbound traffic on the highway. The other lane connects with I–35 at a point farther south, for traffic coming off the highway to Parvin Road. Lewis had driven up on the ramp to the point where the two traffic lanes divided. He had stopped his car horizontally across the entrance side of the ramp, to prevent traffic off Parvin Road entering the highway. This was in the vicinity of an island which is located where the entrance and exit lanes divide. We cannot make out from this record the exact shape and dimensions of this island, but we learn that it is filled with asphalt and bordered by a concrete curb. On the island are located some highway directional signs and markers on metal posts. Lewis had his red lights flashing. He saw the Lincoln come off Highway I–35 traveling at the rate of 60 or 70 miles per hour. The highway patrol car, with its siren and its flashing red lights, was four or five lengths behind it. Lewis testified that as the Lincoln came down the exit ramp he flashed his spotlight once in the direction of the oncoming cars, to attract attention. The front car, the Lincoln, drew near the point where Lewis's police car was stopped; it left the exit ramp and headed directly toward the island. Lewis said: "At this point the car left the roadway immediately after I did this, it left the roadway and started coming across the curb like this. When he started doing this it was quite evident that he was either going to hit these signs here or was going to come right on across." To his horror the speeding car jumped the curb of the island, missed the signs, and came directly toward his stopped car. Lewis scooted toward the passenger side of the seat, "gunned" his car which was in low gear with motor running, and shot over the shoulder into a ditch. The Lincoln missed the rear of his car by inches, coming off the paved portion of the ramp and onto the unpaved shoulder.

It turned west on Parvin Road. The pursuing highway patrol car continued in the exit lane of the ramp, entered Parvin Road behind the Lincoln and the chase continued toward the west without interruption.

The Lincoln turned north off Parvin Road and drove along Davidson at speeds that reached 90 to 100 miles per hour.

It turned east on Vivion. Still traveling at 90 to 100 miles per hour, the driver lost control of the Lincoln and collided with the concrete curb separating the east from the west lines of traffic.

At Antioch Road it went through a red light at 90 miles per hour.

After passing the Antioch intersection it entered a discount store parking lot and executed a wide circular maneuver, Coley in his patrol car following closely. Instead of leaving by the parking lot exit, the Lincoln came out over a large concrete curbing, across a ditch, reentering Vivion Road and striking the center curbing. According to Coley's testimony, the Lincoln became airborne in leaving the parking lot. Its rear license plate was torn off and the underneath part of the car was damaged.

At Chouteau the Lincoln turned south. At this point another police car joined in the chase behind the highway patrolman, red lights flashing and sirens screaming. As the Lincoln went south on Chouteau, the two police cars close behind, it was traveling at more than 110 miles per hour. It was traveling at this speed as it went

through two red lights at the I–435 interchange.

Arriving at the Parvin Road exit again, the Lincoln went through a red light at 80 to 85 miles per hour. Continuing along Chouteau, it slowed down on a hill to about 40 miles per hour. The Kansas City police car, which had followed behind, now caught up and attempted to pass the highway patrol car and the Lincoln in order to execute a "moving road block." The Lincoln accelerated, though, and foiled the plan.

At the entrance to Highway 210, the Lincoln, with the highway patrol car six or seven car lengths to the rear, jammed on its brakes and tried to execute a sharp left turn into the entrance to Highway 210 (which would have put it on the highway going in the wrong direction). He failed to complete the left turn and instead struck dead center a large concrete base of a light standard, three to four feet in diameter. The rear of the car went ten feet in the air, Coley testified, and settled down in a cloud of steam and glass. The highway patrol car, following six or seven lengths in the rear, crashed into the rear of the Lincoln.

The highway patrolman was not injured. He got out of his car and approached the Lincoln on the driver's side. Gonzales, still seated in the driver's seat, tried to crawl away from the approaching officer toward the passenger side of the car. Coley went over the hood of the Lincoln and caught Gonzales as he emerged from the passenger side. Gonzales was still quite belligerent, striking and kicking at Coley, although he had a fractured knee and other injuries. He was taken to the North Kansas City Hospital. There they undertook to give him a breathalyzer test, but abandoned the attempt when he knocked the machine off the table. He was hospitalized for 16 days.

The other occupants of the Lincoln were injured, although one of them was released after examination, without being hospitalized.

*Sufficiency of evidence.*

We first take up defendant's contention that the evidence was insufficient to support the verdict.

Defendant was charged and convicted of first-degree assault, § 565.050.-1(2), RSMo 1978. That statute says a person commits first-degree assault if "[h]e attempts to kill or to cause serious physical injury to another person."

An attempt is defined by § 564.011.1, RSMo 1978, as follows:

A person is guilty of attempt to commit an offense when, with the purpose of committing the offense, he does any act which is a substantial step towards the commission of the offense. A *"substantial step"* is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.

There emerges here a clear requirement that conviction of an attempt to kill or to cause serious physical injury requires proof of a very specific intent on the part of the actor to accomplish that objective. That intent has been described in various ways. The statute uses the language "a firm purpose." In the comments upon § 5.01 of the Model Penal Code, Model Penal Code § 5.01 comment at 27 (Tent.Draft No. 10,1960), the following language is used:

As previously stated, the proposed definition of attempt follows the conventional pattern of limiting this inchoate crime to purposive conduct. In the language of the court, there must be "intent in fact" or "specific intent" to commit the crime allegedly attempted.

Professor Perkins puts it this way:

The word "attempt" meant to try; it implies an effort to bring about a desired result. Hence an attempt to commit any crime requires a specific intent to commit that particular offense. If other elements of an attempt are established "intent is the crucial question." One does not attempt to commit a crime by negligently endangering the person or property of another however great the danger or extreme the negligence.

R. Perkins, Criminal Law, 573–74 (2d ed. 1969).

Did the defendant have a "firm purpose," a "specific intent," an "intent in fact" to ram the police car? Extreme negligence there was, recklessness, heedlessness, "extreme indifference to the value of human life . . . creat[ing] a grave risk of death" to others. One can scarcely imagine a more aggravated case. Our statute punishes such conduct as first-degree assault only if an actual injury results therefrom, § 565.-050.1(3), RSMo 1978, which shows quite plainly a legislative intent not to punish such conduct as first-degree assault where no injury is inflicted.

We have concluded, however, that the evidence was sufficient to show prima facie the requisite specific intent to cause death or serious physical injury. The police car occupied by Lewis was too conspicuous for Gonzales to miss seeing. The island itself was marked by reflective warning signs. Coley said there was nothing to prevent the Lincoln from proceeding safely on the exit ramp, as Coley did, "with ease." Coley said the Lincoln made "a sharp left turn" in order to cross the island and head for the police car. *State v. Hayes,* 572 S.W.2d 882, 885 (Mo.App.1978). *Hayes* involved an application of our assault-with-intent-to-kill statute, § 559.190, RSMo 1969, now repealed, which has been replaced by the first-degree assault statute under which defendant was charged, § 565.050, RSMo 1978. The two statutes are alike, however, in their requirement that there be shown a specific intent on the part of the defendant to cause death or serious physical injury to the victim.

"The intent of one charged with an offense which includes this element is ordinarily not susceptible of proof of direct evidence. Intent may be and usually is shown by circumstantial evidence." *State v. Heitman,* 613 S.W.2d 902, 905 (Mo.App. 1981). See also *State v. Moon,* 602 S.W.2d 828, 831 (Mo.App.1980); *State v. King,* 588 S.W.2d 147, 149 (Mo.App.1979).

*Verdict-directing instruction.*

Defendant complains of the following verdict-directing instruction, which directed the jury to find the defendant guilty of first-degree assault if they found: "First, that on or about June 1, 1981, in the County of Clay, State of Missouri, the defendant attempted to kill or cause serious physical injury to Officer Larry Lewis by driving a motor vehicle at a high rate of speed and attempting to ram the vehicle into a police vehicle driven by Officer Larry Lewis or to force the vehicle off the roadway. . . ."

Specifically, defendant's complaint here is that the jury could have understood said instruction to direct a finding of guilty if they found that the defendant drove a motor vehicle at a high rate of speed and attempted either to ram the vehicle or to force it off the roadway, without also finding that "the defendant attempted [by that means] to kill or cause serious physical injury to Officer Larry Lewis."

We do not rule the point. In view of the fact that the case is being remanded for another trial, the instruction can be redrafted to meet the criticisms which defendant makes of it.

*Evidence of "hypoglycemic reaction."*

The defendant undertook to prove that he was a diabetic and that he was suffering a "hypoglycemic reaction," or "diabetic episode" or "diabetic crisis" at the time of the occurrences in question. This condition, according to the testimony of Dr. Roska, is one that results from a lack of blood sugar in the brain, and would cause "headache, weakness, uncoordination, blurred vision, bizarre behavior, seizures, coma and the other things that I described before." He had earlier mentioned amnesia and stroke-like episodes as accompanying the condition. Too much insulin for the food or sugar in the body may cause it. Alcohol may further lower the blood sugar, worsening the reaction. In response to a hypothetical question hypothesizing defendant's reckless and bellicose behavior on the night in question, the expert testified that such behavior was consistent with a hypoglycemic reaction.

There is no question of the admissibility of evidence tending to prove that defendant's behavior was caused, as he claimed, by

a hypoglycemic reaction. The attorney general expressly acknowledges its admissibility. The evidence would bear upon defendant's intent. As we have shown earlier 'in the opinion, first-degree assault under § 565.050.1(2) requires a showing of a specific intent on the part of the defendant, or an intent in fact. The evidence of a hypoglycemic reaction bears upon his having, and upon his ability to form, such an intent.

There were three offers by defendant of evidence bearing upon the question which were excluded upon the objection of the prosecuting attorney.

First was the testimony of Lillie Brokenicky. She was the Clay County jail nurse on duty at the time defendant was admitted to jail. This was 16 days after the eventful night. The reason for the delay was that he was hospitalized for a period of 16 days as a result of the injuries received in the automobile wreck. Nurse Brokenicky was a nurse at the Clay County jail, who testified that she was the keeper of the jail records concerning the inmates' medical records while they were inmates at the jail. When Mr. Gonzales was brought in she took from him medical information which she wrote down in his records. This included the fact that he was diabetic.

This testimony was excluded upon objection of the prosecuting attorney, and the attorney general seeks to defend that exclusion here by arguing that it was hearsay. Defendant, on the other hand, says that the testimony of defendant's statement to Nurse Brokenicky that he was a diabetic was admissible as an exception to the hearsay rule as a statement made to a physician for purpose of treatment.

█ There is no question that a statement made about one's bodily condition to a physician for the purpose of treatment is admissible, though hearsay. *Davies v. Carter Carburetor, Div. ACF Indus., Inc.,* 429 S.W.2d 738, 750–51 (Mo.1968); *Hughey v. Graham,* 604 S.W.2d 626, 629–30 (Mo.App. 1980).

█ Nor does the statement need to be given directly to the physician in order to be admissible. It is admissible if it is made to a nurse for the doctor's use in treating the speaker.[2] In this case, the nurse did not relay the information to the physician, "because [Gonzales] wasn't going to be with us." She explained that if Mr. Gonzales had stayed in jail, she would have called the doctor, relayed the information to him and then would follow the doctor's orders. The defense counsel offered further to show that the doctor would rely on the information provided to him by the nurse, and would have insulin delivered for a prisoner who was a "brittle diabetic, a type of person who would require the use of insulin."

We gather that Gonzales spent only three or four hours in jail and then was released on bail, but there is nothing in the record to indicate that he knew when he made the statement that he would be released from jail in such a short time.

The court was in error in rejecting this offer of proof, and its exclusion requires reversal.

Defendant further offered to prove by Frances Rayes that defendant, while he was in T.J.'s Lounge during the hours before his encounter with the police officers, was, in the opinion of Mrs. Rayes, suffering a diabetic crisis. The evidence was excluded and that ruling is said by defendant to have been error. The attorney general attempts to defend the ruling on the ground that Mrs. Rayes did not have the expert qualifications to give the offered opinion.

Mrs. Rayes was a practical nurse. She had received formal training in that occupation and had worked at it since 1957. She had worked in hospitals and also as a private duty nurse. She had dealt with diabetics, had been trained in dealing with and treatment of diabetics and had cared for diabetics. She had dealt with insulin-related crises.

**2.** Compare those cases which hold that statements made to nurse as the physician's agent may be privileged communications. 8 Wigmore, Evidence, § 2382 (McNaughton rev. 1961).

On the night of May 31 she had been in T.J.'s Lounge. She apparently was acquainted with Mr. Gonzales, and saw him there. He was uncharacteristically subdued. His lips were pale. He complained of being chilled. "I touched his arm and he was wet. It was like a cold sweat. And his color and his lips were different.... The man seemed to have some reaction of some kind." Later, she said, "I saw him looking worse.... He wasn't talking at all any more. He just sat there and the man looked sick." She had the bartender give him a glass of orange juice with sugar added (a specific for diabetic crisis). Twenty or thirty minutes later he told her he felt a little bit better but that he felt very sick. He left the bar about 1 o'clock a.m.

■ In denying proof of Mrs. Rayes' opinion that defendant was suffering a diabetic crisis, the court erred. Ultimately, the question of the admission of opinion testimony is whether the witness has special familiarity with a subject based upon training or experience or both, which is outside the knowledge and experience of the jurors, which will be of assistance to the jury in deciding the issues. *Garner v. Jones,* 589 S.W.2d 66, 68 (Mo.App.1979); *McKinley v. Vize,* 563 S.W.2d 505, 508 (Mo.App.1978).

■ This is certainly such an instance. From training and from long years of experience, Mrs. Rayes was equipped to give some assistance to the jurors upon a subject with which the ordinary layman would have but slight acquaintance. The attorney general tries to defend the court's ruling on the ground that Mrs. Rayes was not qualified to give an opinion, but she plainly did have some specialized knowledge on the subject gained from training and experience. It was not necessary that she be a physician. *State v. Murrell,* 169 S.W.2d 409, 412 (Mo. 1943). We distinguish here between a witness's opinion as based upon his actual observations of a person's appearance and behavior upon an unplanned encounter,[3] and a witness who makes an examination for the purpose of testifying or who is called to give an opinion upon hypothetical facts. The latter witness will doubtless be held to a higher standard of expertise than the former.

■ The court also excluded the testimony of Dr. Hill that he had treated defendant for diabetes beginning November 18, 1981. This, it will be noticed, was about five and a half months after the time of the alleged offense. There was no showing, or any offer of a showing, that the defendant's condition on November 18 would have any tendency to prove that the condition existed five and a half months earlier. We cannot say that the court abused his discretion in excluding such evidence on the ground of remoteness in time. *State v. Woods,* 508 S.W.2d 297, 300 (Mo.App.1974).

For the errors noted, the judgment is reversed and the cause remanded for a new trial.

All concur.

3. Compare those cases where even a layman is permitted to give an opinion as to one's insanity, *Barnes v. Marshall,* 467 S.W.2d 70, 77–78 (Mo.1971), or to his intoxication, *State v. Fisher,* 504 S.W.2d 281, 283 (Mo.App.1973).