**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Robert ZISMER and Elwyn Gayle Dull,
Defendants-Appellants.**

No. 13874.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 21, 1985.

Morran D. Harris, Osceola, for defendants-appellants.

William L. Webster, Atty. Gen., Mary Elise Burnett, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Presiding Judge.

Defendants Robert Zismer and Elwyn Gayle Dull were convicted by a jury of assault in the second degree by attempting to cause physical injury to another, in violation of § 565.060, RSMo 1978, now repealed. Their punishment was assessed at a fine of $300. They have appealed jointly as permitted by Rule 30.01(b).

In this court, counsel has briefed six assignments of error. They are: 1) that the venue of the crime was not proved; 2) that former § 565.060 was unconstitutional, because it was "vague, indefinite and confusing, in that it fails to require intent, specific intent, or felonious intent, or that the defendants committed the act willfully, wrongfully, unlawfully, deliberately, or feloniously"; 3) Instructions 6 and 8 were prejudicially erroneous because they were vague, indefinite and confusing; 4) there was instructional error because the court instructed down as to Zismer but not as to Dull; 5) the evidence is not sufficient to sustain the verdicts of guilty, and 6) the trial court erred to their prejudice in permitting the defendants to be tried together before the same jury and represented by the same attorney, because it resulted in a conflict on the part of the attorney, in that one defendant was more culpable than the other, but counsel could not properly so argue.

One or two threshold observations are appropriate. Points II and III are essentially the same: the statute was "unconstitutional" therefore the verdict-directing instruction did hypothesize conduct amounting to a criminal offense. If these two points had been properly preserved for review, this court would have no jurisdiction of the appeal. Mo. Const. Art. V, § 3, as amended 1982; *State v. Charity*, 637 S.W.2d 319, 321 (Mo.App.1982). We have concluded, however, that the two assignments of error are not before us for re-

view. Our courts have consistently held that in order to preserve a constitutional issue for appellate review, it must be raised at the earliest time consistent with good pleading and orderly procedure and must be kept alive during the course of the proceedings. *State v. Wickizer*, 583 S.W.2d 519, 523[4] (Mo. banc 1979); *State v. Anderson*, 663 S.W.2d 412, 416 (Mo.App.1983); *State v. Danforth*, 654 S.W.2d 912, 917–18 (Mo.App.1983). The "constitutional" issue which counsel now seeks to argue was not mentioned before the State had presented its case-in-chief. If the defendant wished to challenge the constitutionality of the statute under which he was charged, he should have done so by motion to quash or other attack upon the information before the trial. *State v. Mackey*, 259 S.W. 430 (Mo.1924); *State v. Danforth*, 654 S.W.2d at 917–18[5]. Moreover, a party seeking to present a constitutional issue must do so with some specificity. *City of Florissant v. Rouillard*, 495 S.W.2d 418, 419[1] (Mo. 1973). The assignment of error made in the trial court and on this appeal is, in substance, nothing more than an assertion that a legislative body is obliged to follow common law concepts in creating a statutory crime. Such is not the case. *Gendron v. United States*, 295 F.2d 897, 901 (8th Cir.1961). In any event assignments of error II and III are not before this court as constitutional issues, and because they were not timely raised in the trial court, we are not required to transfer the appeal to the Supreme Court. *State v. Danforth*, 654 S.W.2d at 917[4].

█ Another assignment of error is that the venue of the crime was not proved. The place where the assault was committed was described as being near a barn on the "Roth farm." Conservation Agent Breshears, one of the two men who were assaulted, was asked if this "location" was in St. Clair County. Breshears stated that it was and that he had lived in the area for 19 years. The venue of the action was sufficiently shown.

The meritorious question before the court on this appeal is whether there is substantial evidence to support the judgments of conviction. When the sufficiency of the evidence is challenged, this court must accept as true all evidence and inferences which tend to support the verdicts and disregard all evidence and inferences to the contrary. So viewed, the State's evidence was that on November 14, 1983, Allan Breshears and Tim Ripperger were agents and employees of the Department of Conservation Protection Division working in St. Clair and Hickory Counties. The area in which they were working is a rural area near the boundaries of St. Clair and Hickory Counties. In short, Breshears and Ripperger were "game wardens" and on November 14, 1983, the deer-hunting season was open.

Defendant Elwyn Gayle Dull was a 44-year-old farmer who lived about two miles north of Quincy, in Hickory County. He owned land in Hickory and St. Clair Counties. Defendant Robert Zismer was a 23-year-old carpenter who lived in St. Clair County but ordinarily worked in Camden County. At trial time Zismer had been married to one of Dull's daughters for about eight months. Beginning about 2:30 p.m., the two conservation agents had been in contact with defendant Dull intermittently because they suspected him of unlawful taking or possession of wildlife. Among other things, Dull indicated that a deer had been shot on Zismer's property. Zismer was away at work, so agents Breshears and Ripperger parked their vehicle on the "Pete Roth" farm adjacent to Zismer's property. They intended to ask Zismer about a "button buck" deer and some turkey feathers they had seen in Dull's possession.

About 7:45 p.m., a small pickup truck approached the place where Breshears and Ripperger were parked. The pickup was unlighted, but the two agents had seen "a flash of lights" indicating a vehicle was approaching. Very shortly the unlighted pickup pulled in front of Breshears' vehicle, blocking its movement. Zismer jumped out of the vehicle; Breshears "pulled his headlights on" and both agents got out of their

**352**

patrol car. Then, Breshears testified, "Mr. Zismer was standing in front of my car ... pointing a rifle saying 'I am going to kill you, son-of-a-bitch.'" Breshears dropped to a kneeling position behind the open door of his patrol car.

The interrogation of this witness then continued, thus:

"Q. Did you see the defendant Dull that night?

A. Yes, Mr. Dull was the passenger in the pickup.

He was still in the pickup at that particular time.

Q. Okay, what did he do?

A. He stayed in the vehicle for a few, for a few minutes, seemed like while Mr. Zismer was—he again made the statement that he was going to kill me and I told him at that time that I had my revolver drawn and it was aimed at his chest and for him to throw the gun down, throw the gun down, and this was my third time I had commanded him to drop the gun. At this time Mr. Dull raised it at, in a port-arm position, pointing the gun skyward. Then Mr. Dull started to exit the passenger side and Officer Ripperger advised him to lay down the gun and so he did. He exited the truck and had a long gun, either a shotgun or a rifle, I wasn't sure. He kept it pointed muzzle down, but he would not lay it down or leave it. Again, I order [sic] them to drop their firearms. I was still behind the car door looking over the top of it, between the car and the window, and Mr. Dull went over and took the rifle from Mr. Zismer and laid both guns on the hood of the car with the muzzles pointing away from us.

Q. From the car or the pickup?

A. Excuse me, on the pickup.

Q. Could you see where Mr. Ripperger was at this time?

A. I didn't look for him. I knew with our training, survival techniques, I knew that he was covering the back portion and I was, I had covered myself.

Q. What was the Defendant Zismer's attitude when he got out?

A. He was very belligerent. In fact, when I was calling Agent Campbell on the radio and said there was an assault in progress, to bring the sheriff, that his profanity was heard almost statewide, at least, regionwide. My family even heard it. I have a radio in the house.

Q. Profanity, what was being said?

A. He was saying—he was saying you mother fuckers, fuck you, fuck you, fuck you, and all this stuff was coming over the radio so this was the type of belligerent attitude that he was in at this time.

Q. When he was saying this, was the gun pointed—which way was the gun pointed that he had?

A. When he started the profanity, he still had the gun. He continued it even after Mr. Dull got the gun from him and laid it on the hood. He continued with his barage [sic] of profanity."

The testimony of Agent Ripperger supplemented that of Agent Breshears. His testimony was that Zismer was within 12 feet of Breshears when he pointed a "long-barrel firearm" at Breshears. The interrogation of this witness then proceeded thus:

"Q. Did you see the Defendant Dull at that time?

A. Yes, sir, he was sitting in the passenger side of the small blue pickup.

Q. Okay, did he get out of the pickup?

A. Yes, sir, he did exit the pickup. Before he exited the pickup, I instructed him not to exit the pickup with a gun.

Q. Did he get out of the pickup?

A. Yes, sir, he did. He did get out of the pickup with a long-barrel firearm, also.

Q. And what did he do with that firearm?

A. After I instructed him three to four times to lay the long-barrel firearm down or he was a dead man, he did lay it down on the front of that pickup.

Q. Did he have it pointed at you or either Agent Breshears?

A. No, sir, he did point it, pointed it to the ground.

Q. What else did the Defendant Dull do at that, after he exited the pickup, got out of the pickup?

A. After he laid his firearm down on the hood of the pickup, he walked over and laid the firearm down on Mr. Dull's pickup and also laid it down on the hood.

Q. What was Defendant Dull's attitude during this period of time?

A. Very belligerent [sic], and he was using a lot of profane language and yelling it in a very loud voice.

Q. You say he was using a lot of profanity. What type of profanity was he using.

A. When he first exited the vehicle, he shouted several times, 'I am going to kill you, you son-of-a-bitch.' After that he went into different types of profanity, yelling, 'Fuck you, fuck you, fuck you, you mother fuckers.' "

■ The evidence was amply sufficient to support the judgments of conviction. The statute under which they were convicted was § 565.060, RSMo 1978, now repealed provided in material part:

"1. A person commits the crime of assault in the second degree if:

(1) He knowingly causes or *attempts to cause* physical injury to another person by means of a deadly weapon or dangerous instrument...." (Our emphasis.)

The statute also denounced other closely related offenses and enumerated certain circumstances of excuse or mitigation, but for our purposes, an extended discussion of a repealed statute is unnecessary. Defendants were convicted of an *attempt* to cause bodily injury to the two conservation agents. A criminal defendant is guilty of an attempt to commit an offense when 1) he has a purpose to commit the offense, and 2) he does an act which is a substantial step toward the commission of the offense. The New Missouri Criminal Code: A Manual for Court Related Personnel, p. 9–1 (1978). The commentary upon § 564.011, RSMo 1978, indicates that although the attempt statute has not been fully interpreted, but in this case it is sufficient to look to the Western District's opinion in *State v. Gonzales*, 652 S.W.2d 719, 722–23 (Mo.App. 1983). The court there concluded that a conviction of attempt requires proof of a very specific intent on the part of the actor to accomplish the prohibited objective and observed that the necessary intent may and usually must be shown by circumstantial evidence. *State v. Gonzales*, 652 S.W.2d at 722–23. We are in most cordial agreement.

■ The two elements of the crime rather obviously overlap and proof of one element may also constitute proof of the other. The attempt occurred at night in a rural area. The two defendants approached the place where the agents had parked their vehicle in stealth, without lights. They were armed with rifles or with shotguns, for which they had no purpose at that particular time of day. The only thing that frustrated their design was the agents' quick appreciation of the situation so that the defendants found that the agents "had the drop on them," so to speak. It is of no consequence here that defendant Dull never pointed his weapon at the agents; it has never been required in this state that the act constituting an "overt" act be the ultimate step toward or the last proximate act or the last possible act in the consummation of the crime attempted. *State v. Olds*, 603 S.W.2d 501, 508[9] (Mo. banc 1980). The evidence is amply sufficient to permit any rational trier of fact to find beyond a reasonable doubt that both defendants 1) had a purpose to cause physical harm to the two agents, and 2) committed several acts which were substantial steps toward the commission of the offense.

Defendant Dull complains further that the court erred in "instructing down" in Zismer's case but not in his own. Inspection of the legal file shows that as to defendant Zismer, the court instructed the jury on third-degree assault by reckless endangerment as defined by § 565.070.1(4), and also instructed the jury upon placing the agents in apprehension of immediate

physical injury, as denounced by § 565.070.1(3), again as to defendant Zismer only. The two instructions were essentially former MAI–CR.2d 19.06.1, properly modified. Defendant Dull argues that he was prejudicially affected because he was the less culpable of the two defendants.

■ The instructions on third-degree assault were improperly given. Generally, the use of a deadly weapon in the perpetration of an assault (or attempt to assault) precludes the possibility of a conviction of assault in the third degree. *State v. Manning*, 664 S.W.2d 605, 608 (Mo.App.1984), and see *State v. Olson*, 636 S.W.2d 318, 322 (Mo. banc 1982). However, the general rule applicable to this assignment is much the same as in civil cases; a defendant may not complain of trial errors which affect only his co-defendants. 24A C.J.S. Criminal Law § 1841, p. 581–82 (1962). It is otherwise where the defendants have been jointly prejudiced by the error, Cf. *Ciardullo v. Terminal Railroad Ass'n of St. Louis*, 289 S.W.2d 96, 98[1], 60 A.L.R.2d 516, 521 (Mo.1956). In our view of the evidence, neither party was entitled to an instruction on third-degree assault. Defendant Dull was not entitled to an equal opportunity to be convicted under an erroneous theory and the point has no merit. Defendants' final point is that the trial court erred in permitting the defendants to be tried jointly and that the trial court's action in permitting them to be tried together resulted in a conflict of interest—specifically, counsel asserts, he was unable to argue that one defendant was more culpable than the other.

■ Recently, our colleagues at Kansas City undertook to correlate the definitive cases dealing with that "conflict of interest" which arises from the representation of multiple defendants to the extent that a defendant's Sixth Amendment right to effective assistance of counsel is denied. *State v. Murphy*, 693 S.W.2d 255 (1985). In the course of the opinion, the court reminded us that representation of multiple defendants is not per se violative of a criminal defendant's Sixth Amendment right to

effective assistance of counsel. Further, the court held that the constitutional decisions have produced a two-step criterion by which to determine whether multiple representation of defendants infringes an accused's Sixth Amendment rights. As articulated by the court, the standard, test or criterion involves two inquiries: First, has defendant carried the burden of showing that representation of multiple defendants constituted an *actual conflict of interest;* second, *if an actual conflict of interest* is shown a complaining defendant must go a step further and carry the burden of showing that the conflict of interest *adversely affected* counsel's performance in his representation of the defendant. *State v. Murphy,* at 260–261.

■ We are unable to perceive the first necessary element in this case, and are further handicapped by a record which does not preserve the argument. The "actual conflict" consists in counsel's perception that Dull was less culpable than Zismer, but that is a misperception. Dull was simply more prudent in the face of drawn sidearms; he was not less culpable. Because we do not have the arguments before us, we do not know what might have been argued more effectively. On the record, we are asked to hold that representation of multiple defendants is per se violative of constitutional guarantees of effective assistance of counsel. That is not the law and we decline so to hold.

We find no error in any respect properly preserved for review in this court. Accordingly, the judgments are in all respects affirmed.

PREWITT, C.J., and CROW, J., concur.

MAUS, J., concurs in result.