**Brent ENGLAND, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 60594.**

Missouri Court of Appeals,
Western District.

Sept. 24, 2002.

James R. Hobbs, W. Brian Gaddy, Kansas City, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Dora Fichter, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

Before ELLIS, C.J., NEWTON and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

Brent England appeals the denial of his Rule 24.035 [1] Motion, in which he sought to set aside his guilty plea to first-degree assault and sentence of fifteen years. We reverse and remand because there was an insufficient factual basis to establish that England knowingly and voluntarily pled guilty to the charged offense.

## Facts and Procedural History

On July 8, 1999, Brent England and Sean Romeiser spent most of the day together drinking and riding around Chillicothe. That evening, they decided to do further "road tripping" with Joseph Woods and Chris Mills. At some point during the evening, Woods asked the group whether they "were in or out." Woods refused to explain more until the group agreed they were "in." Woods then shared his plan to shoot at "this lady's house" to show her that she "cannot mess with his family" and to "scare her."

The group of four drove to Woods' grandparents home where they obtained guns. They got back into the car and Romeiser drove while Woods handed out guns to Mills and England. They arrived in Dawn, Missouri, about 4:00 a.m. and went to a house Woods pointed out. Woods, Mills, and England got out of the car and fired shots toward the house. Woods aimed at a particular window. England aimed randomly toward the house. England thought someone was probably inside the house but did not know for certain. Although no lights were on at the time, England thought his gunshots hit the house. All three shooters fired until their guns were empty, then jumped in the car and rode away.

The next day, a newspaper reported that the house belonged to Mandy Cheeney, a former supervisor of Woods and England.

Cheeney's four-year old daughter, Beth, was injured when her head was grazed by one of the bullets fired into the house. One day later, Woods committed suicide.

Criminal charges were filed against Mills, Romeiser, and England. England was charged with first-degree assault for attempting to kill Mandy Cheeney, second-degree assault for recklessly causing injury to Beth Cheeney, and for unlawful use of a weapon, a Class A felony if a firearm is discharged "at or from a motor vehicle" and causes injury. England pled guilty and was sentenced to consecutive prison terms of fifteen years, seven years, and twenty years, respectively, on the three counts.

On September 21, 2000, England filed a Rule 24.035 Motion to Vacate, Set Aside, or Correct Judgment or Sentence. At an initial hearing on the motion, the State conceded there was an insufficient factual basis to convict England on the Class A felony of unlawful use of a weapon and agreed to reduce that Count III charge to a Class D felony. England pled guilty to the reduced charge and his sentence on Count III was lowered from twenty years to five years of imprisonment, to run concurrently with the seven-year sentence on Count II.

At a subsequent Rule 24.035 hearing, the motion court heard arguments on England's claim of an insufficient factual basis to support the conviction on Count I for first-degree assault. The court made, in relevant part, the following findings of fact and conclusions of law in denying this claim:

On July 8, 1999 the Movant accompanied three companions to the residence of Mandy Cheeney in Dawn, Livingston

---

1. All rule citations are to Missouri Rules of Criminal Procedure (2002) unless otherwise

noted.

County, Missouri. Movant knew before leaving Chillicothe, Missouri that at least one of the others intended to shoot at her house. Movant fired multiple shots from a .22 pistol at the house while two of his companions did likewise with their weapons. Movant knew that people lived in the house and that at 4:00 a.m. they were likely to be present. Movant intended they be home when he shot into their house.

Based upon the foregoing Findings of Fact, the Court does make the following conclusions of Law: ...

The actions of Movant and his companions undertaken with the knowledge and intent of Movant that the occupants of the residence be present, and the consequences reasonably foreseeable to Movant arising from his firing repeatedly at that residence while he believed them to be present, lead to the conclusion that Movant intended to kill someone in that house....

England appeals.

### Standard of Review

Appellate review of the denial of a postconviction motion is limited to a determination of whether the findings of fact and conclusions of law are clearly erroneous. Rule 24.035(k); *State v. Tokar*, 918 S.W.2d 753, 761 (Mo.banc 1996). Findings and conclusions are deemed erroneous if, after reviewing the record, we are left with the firm impression a mistake has been made. *Saffold v. State*, 982 S.W.2d 749, 752 (Mo. App. W.D.1998).

### Voluntariness of Guilty Plea

■ England's sole point on appeal is that there was an insufficient factual basis to sustain his conviction for first-degree assault. He claims his decision to plead guilty was not made knowingly and voluntarily because he did not understand the

nature of the offense to which he pled. Although England's Rule 24.035 motion stated a cognizable postconviction claim, the motion court found a factual basis existed for the guilty plea and refused to vacate or set aside the conviction and sentence for first-degree assault. *Saffold*, 982 S.W.2d at 752 (lack of factual basis for guilty plea is actionable under Rule 24.035).

■ Rule 24.02(e) provides that a court shall not enter judgment on a guilty plea unless there is a factual basis for the plea. Before accepting a plea, the court must elicit facts which the defendant admits by his plea and determine that those facts indicate his guilt on the offense charged. *Carmons v. State*, 26 S.W.3d 382, 384 (Mo.App. W.D.2000). A defendant is not required to recite facts establishing the offense; a factual basis can be established if the defendant understands the facts recited by the judge or prosecutor. *Id.* A defendant should, however, express "an awareness of the nature and elements of the charge to which he or she pleads guilty." *Id.* (quoting *Vann v. State*, 959 S.W.2d 131, 134 (Mo.App. S.D.1998)). The recital of a factual basis for the charge helps to ensure the defendant's plea is knowing and voluntary. If the facts presented during the hearing do not establish commission of the charged offense, the court must reject the guilty plea. *Id.*

In Count I of the Information, England was charged with first-degree assault for attempting to kill Mandy Cheeney. Count I states in relevant part:

> The Prosecuting Attorney ... charges that the Defendant, acting in concert with others, in violation of Section 565.050 RSMo., committed the class B felony of **ASSAULT in the first degree** ... in that on or about July 8, 1999 ... the Defendant attempted to kill Mandy

Cheeney by repeatedly shooting into her house while she was present therein.

▮ Count I was filed pursuant to § 565.050.1, which defines first-degree assault as follows:

A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person.

The statute requires that a person charged with first-degree assault must have acted knowingly and willingly. *State v. Thomas,* 972 S.W.2d 309, 313 (Mo.App. W.D.1998). Where the assault charge is based on an attempt to kill, courts have applied a heightened mental state, requiring evidence that the defendant acted "purposefully." *State v. Whalen,* 49 S.W.3d 181, 186 (Mo.banc 2001). Thus, a conviction for first-degree assault by "attempt to kill" requires proof of "a very specific intent on the part of the actor to accomplish that objective." *State v. Gonzales,* 652 S.W.2d 719, 722 (Mo.App. W.D.1983). There must be evidence of the defendant's specific intent to cause the victim's death. *Id.* at 723.

At England's plea hearing, the court reviewed his Plea Petition, wherein England stated he understood the charges against him and had discussed them with counsel. The Plea Petition recited in England's own words the acts he committed in connection with the charges against him: "I, Brent England, rode in a friend[']s car to Dawn, Missouri. The three of us got out of the car and shot towards the house. A girl got hit in the head with a bullet."

The court further questioned England at the plea hearing as follows:

Q. [COURT] And have you seen a copy of the information that the State has filed against you?

A. [ENGLAND] Yes.

Q. And did you understand this charge and did your Attorney go over it with you?

A. Yes.

. . .

Q. All right. If you could tell me with your own words what you did on or about the 8th day of July, 1999, that gave rise to these charges.

A. I went with a friend to party and we were cruising around and later on we met with two other friends and

Q. Who was that?

A. Joseph Woods and Chris Mills.

Q. All right.

A. And they asked us if we wanted to go roadtripping and we said yes. And we went to Linneus and on the way back Josh Woods asked if we were in or out. Wouldn't tell us what it was until we said we were in or out, so I said I was in. And Sean Romeiser said he was in. And he told us about it and we went back to—

Q. Okay. He told you about what?

A. About how he was planning on shooting at this lady's house.

Q. All right. Did you know at the time whose house it was?

A. No, Your Honor.

Q. Did you know who it was at all?

A. No.

Q. All right. Go ahead.

A. Well, yes I knew. The lady was my boss.

Q. All right. And what's her name?

[DEFENSE ATTORNEY]: Can— I'm sorry. Can I interrupt?

[COURT]: Sure.

[DEFENSE ATTORNEY]: At that time?

[ENGLAND]: No.

[DEFENSE ATTORNEY]: Right. Now we know?

[ENGLAND]: Know. Now, I know that lady was my-

Q. [COURT] Okay. But at that time you didn't know?

A. [ENGLAND] No.

Q. All right. Go ahead.

A. And we went to his grandfather's house and Josh Woods and Chris Mills got the guns and we left and headed for Dawn and when we got to Dawn, to the lady's house, me, Josh Woods and Chris Mills got out and shot towards the house and we got back in and went back to his grandparents' house and they cleaned the guns and took me to my car.

. . .

Q. And did you—did you aim towards the house?

A. Yes.

Q. Do you think you hit the house?

A. Yes.

Q. What kind of gun did you use, if you remember?

A. A .22 pistol.

Q. Were there any lights on in the house?

A. No.

Q. Did you aim any particular direction or any part of the house?

A. No.

Q. When did you find out whose home it was?

A. When—The next day.

Q. All right. And how did you find that out?

A. It was in the newspaper.

Q. Did you shoot more than once?

A. More than once.

Q. At what time of the day was this?

A. It was maybe four in the morning.

Q. 4:00 a.m.?

A. Yeah.

Q. What can you tell me about the injury that was caused to Beth Ann Cheeney?

A. A bullet grazed across her forehead as far as I know.

Q. And was that as a result of the shots that were fired in that house by you and the other Defendant?

A. Yes.

. . .

Q. Did you know that people lived in that home when you were shooting at it?

A. Yes.

Q. And you knew further that at 4:00 a.m. those people were probably at home; is that a fair statement?

A. I thought they probably would be. I wasn't absolutely 100 percent for sure.

Q. But you thought they were.

A. Yeah.

Q. And that was your intent that they be home when you shot into the house?

A. That was [Woods'] intent.

Q. It was not yours?

A. I guess.

Q. It was? You need to say it was or wasn't.

A. Well, it was his intent and I was following along with that.

Q. So you intended to do the same.

A. Yes.

. . .

Q. All right. Mr. Roberts?

[PROSECUTOR]: Your Honor, that is, essentially, what the State's evidence would be. . . . The only thing I

would add is each of the Defendants fired until they ran out of ammunition. The State's position, obviously, as you've pointed out in your line of questioning to the Defendant, that at four o'clock in the morning you can reasonably anticipate somebody is going to be home and if you fire in your house then it can be reasonably anticipated that you intend to do them *injury*. By so doing a bullet fragment did graze the head of Beth Ann Cheeney, a child of four years. She has recovered very well. [emphasis added]

Q. [COURT]: As to what [the Prosecutor] just said, do you have any disagreement at all?

A. [ENGLAND] No.

Q. You would adopt his statement as your own?

A. Yes.

Based on these excerpts from the plea hearing transcript and the Plea Petition, we find no facts establishing that England had a specific intent to kill when he fired gunshots into Mandy Cheeney's home. England testified that he shot randomly at the house without knowing for certain whether anyone was inside. The prosecutor argued that it could be reasonably anticipated that someone would be home at 4:00 a.m., and that England obviously intended to cause "injury" by firing shots into the home. However, England was charged with *attempt to kill*. While his admissions at the plea hearing show he acted recklessly and arguably support his Count II conviction for second-degree assault, there were no specific facts elicited to establish that England acted purposefully to cause Mandy Cheeney's death.

The facts here are similar to *State v. Kester*, 201 S.W. 62 (Mo.1918), where the defendant was tried on the charge of assault with intent to kill after he fired a gunshot in the direction of a home at approximately 9:30 p.m. The shot wounded a woman standing in a window of the home, but there was no evidence the defendant could have seen the woman from where he fired. *Id.* at 62. The defendant had threatened to kill the woman's husband on the day prior to the shooting. *Id.* Finding the evidence insufficient to support a conviction for assault with intent to kill, the Missouri Supreme Court held:

The only affirmative testimony here as to the intent other than that to be deduced from proof of prior conduct is that the appellant shot in the direction of the house; there is nothing to show that he saw or could have seen Mrs. Barnes therein. Firing in the direction of the house, therefore, although the presumption may reasonably be made that appellant knew there were human beings therein, will not suffice to establish such an intent as is required to render him guilty as charged.

*Id.* at 63.

At best, the evidence at England's plea hearing allowed a presumption that he *should have known* someone was in the house when he fired the gunshots around 4:00 a.m. As in *Kester*, and the more recent case of *State v. Whalen*, 49 S.W.3d at 185, this presumption is insufficient to establish that England knew Mandy Cheeney was in the home and that he intended to kill her. Accordingly, there was not a proper factual basis for the court to accept his plea to the charge of assault with intent to kill.

Our review does not end here, as the State argues England was charged under a theory of accomplice liability for acting in concert with Woods, Romeiser, and Mills. To establish a factual basis for this theory, the State contends it only had to show "some proof of [England's] participation in the crime" and that England's

"intent can be inferred from the circumstances." The State's argument suggests that if any of the accomplices had the requisite intent to kill, that mental state can be imputed to England.

▬▬▬ We disagree. Establishing accomplice liability requires the State to prove that a defendant: 1) purposely promoted an offense, and 2) had the culpable mental state for the charged offense. *State v. Neal*, 14 S.W.3d 236, 239 (Mo.App. W.D.2000); see also § 562.036. While the conduct of other persons participating in or committing the offense may be imputed to the defendant, the mental state cannot be imputed. *Id.* The defendant's intent may be inferred from the circumstances of the crime but can not be based on the intent of his co-participants. See § 562.051.

Even under the accomplice liability theory, the State can not infer that England had the specific intent to kill based on the circumstances of this case. Neither the conduct of England or his accomplices indicates they knew Mandy Cheeney was home and purposely sought to cause her death.

Our review of the record does not support the motion court's finding that there was factual basis for his guilty plea on first-degree assault with intent to kill. Without this factual predicate, we cannot conclude that England understood the nature of the charge against him and voluntarily entered his guilty plea on Count I.

The motion court's judgment is reversed on this claim. The case is remanded with instructions that the motion court set aside the guilty plea on Count I and vacate the conviction and sentence.

All concur.